UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

KEITH RANIERE, CLARE BRONFMAN, ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN, and NANCY SALZMAN,

                     Defendants.

No. 18 Cr. 204 (NGG) (VMS)

---

# MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MEMORANDUM REGARDING DEFENDANTS' ASSERTIONS OF ATTORNEY-CLIENT PRIVILEGES

HAFETZ & NECHELES LLP

Susan R. Necheles
Kathleen E. Cassidy
10 East 40th Street, 48th Floor
New York, NY 10016

*Attorneys for Defendant
Clare Bronfman*

January 11, 2019

**INTRODUCTION**

Defendant Clare Bronfman respectfully submits this memorandum of law in opposition to the government's memorandum regarding defendants' assertions of attorney-client privileges, and in opposition to the government's request that the Court issue an Order invalidating certain privileges held by Ms. Bronfman and NXIVM. The government's attempt to invalidate these privileges is premature, overbroad, and suffers from a lack of understanding of certain basic principles governing attorney-client privilege. The Court should reject the government's attempts to invade Ms. Bronfman's and NXIVM's lawful attorney-client privilege. Instead, the Court should instruct the government to allow the taint team to continue reviewing the potentially privileged documents, in consultation with the defendants and NXIVM's counsel, and to reapply to the Court for relief if and when it has a basis to invalidate the privilege of any particular documents as to which defendants or NXIVM maintain privilege.

**I.     The Court Should Reject the Government's Motion as Premature and Order the Government to Continue the Meet-and-Confer Process.**

The government's argument with respect to supposed privilege disputes is premature as there is not yet any dispute ripe for resolution by the Court. The government essentially seeks an advisory opinion to guide its privilege review, which is neither appropriate nor an efficient use of the Court's or the parties' resources.

Throughout its brief, the government claims that defendant Bronfman has "asserted an attorney-client privilege" over materials in the government's possession, and then takes aim at those supposed assertions. This misrepresents Bronfman's position and the nature of the process the parties have been engaged in to this point.

1

The facts are as follows:

The government seized the *entirety* of Ms. Bronfman's email account through the execution of two separate search warrants. The total number of documents seized from her email account was approximately 112,311. Her email account includes many thousands of emails with lawyers, since not only has Bronfman retained attorneys in her personal capacity and for businesses unrelated to the present criminal case, but Bronfman also had responsibility for managing NXIVM's legal affairs and was at times the primary liaison between NXIVM and its attorneys, including in active litigations that spanned years. Yet, before conducting any review of the contents of Bronfman's email account to identify which documents were within the scope of the warrant (and which were beyond the scope and therefore, irrelevant to the taint team's privilege review), the government asked Bronfman's counsel for a list of attorney names and firms that Ms. Bronfman may have communicated with.

The government then used those attorney and firm names as search terms, and segregated approximately 23,924 emails as potentially privileged solely because they hit on the search terms (the "Potentially Privileged Documents"). Neither the government (to our knowledge) nor the defense has conducted a comprehensive review of those Potentially Privileged Documents to cull out items that are not in fact privileged. Necessarily, the set of Potentially Privileged Documents includes many documents that are not actually privileged: for example, emails with lawyers that are forwarded to or copied to someone who destroys privilege, emails that are sent to lawyers on the list but are sent to them in a non-legal capacity, and emails and documents that mention a lawyer's name but that are not themselves privileged.

Thus, it is inaccurate to say that defendant has "asserted privilege" over the 23,924 Potentially Privileged Documents. Defendant has not undertaken to review 23,924 Potentially

2

Privileged Documents to determine which are privileged, which are not, or to create a privilege log for the privileged documents. Nor is it reasonable to ask the defense to undertake that task at this point. The prosecution team has refused to ask the taint team to determine which of the Potentially Privileged Documents are even within the scope of the warrant, and it would be a massive waste of defendant's limited time before trial to be forced to review and log the universe of seized Potentially Privileged Documents—many of which are not within the scope of the warrant or relevant to the case.

As defendant has offered from the beginning, we will review any documents that the taint team identifies to us as documents which are within the scope of the warrant and which the taint team believes are not privileged; if the parties disagree after conferring, the taint team can submit the documents for *in camera* review to this Court—at which point there will be an actual controversy for the Court to address.

The government neglects to mention that the process requested by defendant has in fact already begun, albeit only recently.

On December 21, 2018 the taint team identified to defendants the *first* subset of the Potentially Privileged Documents that it believed were not privileged, including 644 documents seized from Bronfman's email, and the taint team represented that more sets of documents for the defense's review would be provided on a rolling basis.[1] On January 8, 2019 after conferring with counsel for other relevant parties, Bronfman responded by asserting privilege over *only 47* of the 644 documents. Defendant is obviously engaging in the taint team's review process in

---

[1] On December 6, 2018 the taint team had identified a handful of documents that defense counsel responded to by asserting privilege over 6 documents and agreeing that 2 documents were not privileged. The government has been in possession of Ms. Bronfman's emails since the warrants were executed on March 8, 2018 and October 15, 2018, and has had the list of attorney names since August 16, 2018.

3

good faith, and there is every reason to believe that the ongoing process of allowing the parties to confer on the set of Potentially Privileged Documents that the taint team believes are not privileged will be productive. This process will ultimately save the Court and the parties from unnecessary and time-consuming litigation and *in camera* review, including of documents that the prosecution team may ultimately decide are not even within the scope of the warrants.

Notwithstanding the substantial progress that could be made by continuing this conferring process, the government attempts to short-circuit its obligation to review the Potentially Privileged Documents it seized from Ms. Bronfman and to reallocate the responsibility of reviewing those materials to the Court by claiming that Ms. Bronfman has made "assertions of privilege" that are unreasonable and then asking the Court to address those assertions in the abstract rather than by reference to particular documents—an impossible task that will result in the Court needing to review possibly thousands of documents *in camera*.

We ask the Court to reject the government's attempt to shift its burden to review seized documents onto the Court, and to rule that the parties should continue to engage in the process that has already begun in which (1) the taint team identifies any documents it does not believe are privileged, (2) defendants respond identifying which, if any, documents they believe are privileged, and (3) the taint team can move for *in camera* review of any documents which remain in dispute.

## II. The Government's Motion to Have the Court Declare that Certain Categories of Documents are Not Privileged Should Be Rejected.

### A. Immigration Related Communications

The government asks the Court to hold, as a blanket statement, that "no valid privilege can attach to communications between attorneys, applicants for United States visas, and a third party," Dkt. 256 at 1, 19. The government is simply wrong that under no circumstances can

4

Bronfman or NXIVM assert privilege over communications with immigration attorneys that also include visa applicants.

Privilege is necessarily an individualized and fact-specific determination. When making a determination about whether an attorney-client relationship exists the key inquiry is "the intent of the client and whether he reasonably understood the [communications] to be confidential." *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988) (addressing whether a witness believed defense counsel was acting as his attorney and remanding for a factual determination). *United States v. Devery,* 1995 U.S. Dist. LEXIS 4799, at *26 (S.D.N.Y. Apr. 7, 1995) (finding communications between a potential government witness and defense attorney were privileged because in examining the witness's intent the court found he "believed that he was engaging in confidential communications with his potential counsel"). We address below the broad categories of communications that the government asserts cannot be privileged as a matter of law, and the reasons why the government is wrong that under *no* circumstances can the privilege cover communications that include an attorney, a visa applicant, and a third party.[2]

### 1. Communications Among NXIVM's Representatives, Immigration Counsel, and NXIVM Employees Relating to the Employee's Immigration Status

The government makes the surprising assertion that communications among a board member or officer of a corporate entity, the entity's attorney, and an employee of the entity cannot be privileged in the immigration context. Dkt. 256 at 9-10; 20-25.

---

[2] While we believe the Court can reject the government's motions based on the principles of law we set forth here, we recognize that the determination of whether a privilege exists is dependent on the specific facts of each relationship and communication and requires an individualized review—which would be premature when the government has not yet identified to the defense the documents that it believes are not covered by a lawful privilege and are within the scope of the warrants.

5

First, this ignores decades of well-settled law on the privilege of a corporate entity. Much like an individual, the attorney-client privilege extends to corporate entities. But quite obviously "[a] corporation cannot speak directly to its lawyers . . . these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation." *Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 348 (1985). Communication with counsel "must of course take place through the participation of an individual speaking for the client—be it an officer or a director or the entire Board of Directors." *Fitzpatrick v. Am. Int'l Grp., Inc.*, 272 F.R.D. 100, 107 (S.D.N.Y. 2010) (internal citations omitted). Even a "low-level employee" acting as a corporate representative can be "properly viewed as acting in his corporate fiduciary capacity in undertaking" communication with counsel. *Id*.

Thus, including a company employee on communications when a higher-ranking corporate representative consults with counsel does not result in the loss of the privilege. While "dissemination of privileged information to third parties generally waives attorney-client privilege, the distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege." *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 519-20 (S.D.N.Y. 2001); *see also Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 598 (S.D.N.Y. 2015). Communications among corporate employees "regarding legal advice given by counsel to the corporation" is protected by the attorney-client privilege. *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995). "[A] privileged communication does not lose its protection if an executive relays legal advice to another member of management who shares responsibility for the subject matter underlying the consultation." *EEOC v. Sterling Jewelers, Inc.*, No. 08-CV-0706, 2017 U.S. Dist. LEXIS 3011, at *9 (W.D.N.Y. Jan. 3, 2017) (internal citations omitted). Nor does "the distribution within a corporation of legal advice

received from its counsel . . . vitiate the privilege." *Au New Haven, LLC v. YKK Corp.*, No. 15-CV-03411, 2016 U.S. Dist. LEXIS 160602, at *7 (S.D.N.Y. Nov. 18, 2016); *see also Bank Brussels Lambert*, 160 F.R.D. at 442 (S.D.N.Y. 1995) (citing *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 518 (D. Conn)).

There is nothing specific to the immigration context which would alter the basic rules of corporate attorney-client privilege, and indeed, there are particularly strong reasons why the corporate attorney-client privilege would operate to *protect* the privilege in cases where the corporation and an individual employee are collectively petitioning for immigration status for the individual employee or prospective employee, which is what is at issue here.

Under longstanding law, a U.S. corporation is the only entity authorized to petition United States Customs and Immigration Services ("USCIS") for the majority of employment-based visas. *See* 8 CFR § 204.5(c). Other USCIS regulations also make clear that only the petitioner, not the beneficiary, has standing to appear before the agency. *See* 8 C.F.R. §§ 103.2(a)(3) & 103.3(a)(1)(iii)(B) (indicating that "[a] beneficiary of a petition is not a recognized party" and "the person or entity with legal standing in a proceeding . . does not include the beneficiary of a visa petition"). This legal framework was reiterated by the Board of Immigration Appeals in *Matter of Sano*, 19 I. & N. Dec. 299, 299, 1985 BIA LEXIS 11, *1 (B.I.A. October 29, 1985) (ruling "[a]n appeal from the denial or revocation of a visa petition may be filed only be the petitioner" and finding the Board of Immigration Appeals had no "jurisdiction to address an appeal by the beneficiary from the denial of a visa petition"). Thus, the government simply has no basis to suggest that the lawful representative of the petitioning employer, whether it is Clare Bronfman on behalf of NXIVM or another company, or another

7

corporate representative of NXIVM cannot have an attorney-client relationship with the company's immigration counsel.

Moreover, communications among counsel, the employer/petitioner, and the employee/beneficiary will typically be necessary, for example, to gather all the information necessary to prepare an immigration strategy and assemble the required personal information to complete an application. Accordingly, in this context, an attorney will generally represent *both* the petitioner and beneficiary. As explained in the leading article addressing the topic of dual representation in immigration practice:

> In immigration practice, it is very common [to have dual or multiple representation when a lawyer represents two (or more) co-clients in a single matter], because many immigration benefits, such as family-based or work-related immigration status, involve joint action by an alien beneficiary and an employer-petitioner or a U.S. citizen (or permanent resident).

"Dual Representation in Immigration Cases," by Bruce A. Hake, AILA Doc. No. 05060724, June 7, 2005, https://www.aila.org/practice/ethics/ethics-resources/2005-2011/dual-representation-in-immigration-practice at 30.

The application of these principles to the documents that the government asserts cannot possibly be privileged under any circumstances establishes that the government's position is profoundly mistaken. The government claims that communications "involving a number of Nxivm representatives—including defendants Bronfman, Nancy Salzman and Russell—and non-citizen visa applicants relating to 'immigration application[s] and documents'" (Dkt. 256 at 9-10) cannot be privileged. But under the elementary principles of corporate privilege discussed above, there is no reason why, based solely on the identity of the participants, that communications about immigration matters where NXIVM is the sponsor and which include Bronfman (a member of the Executive Board of NXIVM), Nancy Salzman (the President of

8

NXIVM), or Russell (a bookkeeper at NXIVM), and non-citizen visa applicants who are employees of NXIVM would not remain privileged.

Furthermore, even if the non-citizen employee beneficiary were not covered by the corporate privilege, the relationship among the parties would in most cases be a multiple representation in which both the non-citizen beneficiary and the employer-petitioner are both considered clients of the attorney. It is well-established that communications between a lawyer and her joint clients are privileged. *See* Restat 3d of the Law Governing Lawyers, § 75 (2000).

The only case the government cites in support of its assertion that privilege cannot "be established over communications between the attorney, alien, and employer," is a district court case from Iowa, *In re Antunez de Mayolo*, No. 06-MC-64, 2007 U.S. Dist. LEXIS 27912 (N.D. Iowa Apr. 16, 2007). Dkt. 256 at 23, 25. However, the *Antunez de Mayolo* court explicitly declined to reach the question of whether there could be a joint privilege that covered communications involving both the employee-applicant and employer-sponsor. *Antunez de Mayolo*, 2007 U.S. Dist. LEXIS 27912, at *26. Only in dicta did the court express skepticism that such a joint privilege was possible—and there were good reasons for skepticism there based on the distinctly dissimilar facts of that case as compared to this one. The employer in the *de Mayolo* case never sought to become the attorney's client and never paid any legal fee to the attorney. The court found that the employees were the clients, the ones who had a "signed written contract with the [attorney] and paid her fee." *Id*. at *17. Even more significantly, the employer "never sought out legal advice, service or assistance, from the attorney." *Id*. at *18. The employer met with the attorney on one occasion and the meeting was arranged by the employees to convince the employer to put an advertisement in the paper, a necessary step in legalizing their employment status. There was the additional issue of waiver because a third-

9

party relative was present during the employer's discussion with the attorney—further undermining any intention the employer had of seeking advice or establishing an attorney-client relationship. *Id*. at *19-21. Thus, the facts of that case are very different from the very common scenario of employer-sponsored visas implicated in this case. Dkt. 256 at 23.

    2. *Communications Among ESF Representatives, Immigration Counsel, and ESF Employees Relating to the Employee's Immigration Status*

The government is also incorrect, for the same reasons noted above, in their assertion that communications between Ms. Bronfman, as owner of Ethical Science Foundation (ESF), ESF's attorney (either immigration attorney Jonathan Ware or Frontier Solutions), and ESF's employee or prospective employee cannot be privileged. These communications, too, are protected under the corporation's attorney-client privilege and at least are presumptively privileged: ESF is seeking legal advice and assistance regarding immigration matters from attorneys as the petitioning party/prospective visa sponsor, and in some instances the beneficiary of the prospective visa petition is copied. Copying the intended beneficiary does not break the corporation's privilege, either pursuant to the principles of corporate attorney-client privilege or because the lawyer is acting jointly for both prospective sponsor and beneficiary.

    3. *Communications with Frontier Solutions about M.F.*

The government spends much of its brief discussing Bronfman's efforts to obtain a visa for a Mexican national referred to as M.F., and claims that there is no way in which Bronfman "has [any] standing to assert a privilege on behalf of M.F. or any other visa applicants who sought legal advice from Frontier Solutions." Dkt. 256 at 20.

There is no dispute that Ms. Bronfman made efforts, including by retaining Frontier Solutions, to try to help M.F. and others obtain legal status to move to the United States. Ms. Bronfman had retained Frontier Solutions in 2015 to obtain legal advice for herself and her

10

companies regarding immigration matters. Thus, contrary to the government's assertions, Ms. Bronfman was a client of Frontier Solutions and clearly had an attorney-client relationship with Frontier Solutions attorneys. Based on the non-privileged emails the government has described in its brief, one of the areas Ms. Bronfman sought legal advice about was how M.F. could legally obtain permission to enter the U.S., and what the requirements were for those visas. Dkt. 256 at 5-8. M.F. also subsequently entered into a formal attorney-client relationship with Frontier Solutions with regard to her possible legal options to obtain a visa for U.S. entry.

The inclusion of both Ms. Bronfman and M.F. on emails with Frontier Solutions attorneys or staff does not break the privilege that exists between each of them and Frontier Solutions for two reasons. First, both Bronfman and M.F. were clients of Frontier Solutions; there was no conflict between them, and no reason why Frontier could not represent them both jointly with respect to the same legal matter of seeking a visa for M.F.[3] Further, as is recited in the non-privileged emails cited by the government, two of the possible legal options for obtaining entry to the U.S. that were considered by Frontier with respect to M.F. were E-2 and EB-5 visas. Dkt. 256 at 6-8. As described in the government's brief, both E-2 and EB-5 visas are issued on the basis of an investment in a U.S. company, and thus would have required coordination with U.S.-based companies and persons; Ms. Bronfman was considered a joint client of Frontier for these purposes as well. It was the intent of both individuals, as made clear

---

[3] The government treats Raniere and Bronfman as if they are in the same position with respect to whether their inclusion on emails with Frontier and/or M.F. regarding M.F.'s immigration status breaks privilege. Dkt. 256 at 20. They are not. Unlike Raniere, Bronfman had retained Frontier Solutions, paid for their legal services, and sought legal advice from Frontier attorneys directly with respect to M.F.'s immigration status. Significantly, when this issue arose in the meet-and-confer process with the taint team, Bronfman did not maintain privilege over emails regarding M.F.'s immigration status that were shared with Raniere.

11

by their communications, that Frontier Solutions was acting as counsel for them both and any communications among them would remain confidential.

An additional reason why communications with Frontier Solutions that included Bronfman and M.F., remain privileged is that there was a common interest between them that preserves the privilege. Courts have recognized that a "need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). The common interest doctrine ensures protection of attorney-client communications in these types of situations. "As in all claims of privilege arising out of the attorney-client relationship, a claim resting on the common interest rule requires a showing that the communication in question was given in confidence and that the client reasonably understood it to be so given." *Id.* at 244.

There need not be any actual litigation in progress for the common interest doctrine to apply. *Id*. Rather the doctrine is intended to "preclude[] a waiver of the underlying privilege concerning confidential communications between the parties made in the course of an ongoing common enterprise and intended to further the enterprise, irrespective of whether an actual litigation is in progress." *HSN Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 71 (S.D.N.Y. 2009) (internal citations omitted); *see also Lazare Kaplan Int'l, Inc. v. KBC Bank N.V.*, No. 1:11-CV-09490, 2016 U.S. Dist. LEXIS 96766, at *6 (S.D.N.Y. July 21, 2016) (holding that "parties may share common legal interest even if they are not parties in ongoing litigation"). "At its core, the 'common interest' doctrine applies when multiple persons are represented by the same attorney." *Bank Brussels Lambert*, 160 F.R.D. at 446 (S.D.N.Y. 1995) (internal citation omitted). In dual representation situations "communications made to the shared attorney . . . remain privileged as to the rest of the world." *Id*. There is no question that M.F.

12

and Bronfman were engaged in the common endeavor of seeking a legal way for M.F. to enter or remain in the United States; their belief that their communications with Frontier in furtherance of that common endeavor were confidential was entirely reasonable under the circumstances. *See HSN Nordbank AG N.Y. Branch*, 259 F.R.D. at 71 (S.D.N.Y. 2009); *see also Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.,* 258 F.R.D. 95, 100 (S.D.N.Y. 2009) (finding the "attorney-client privilege would encompass any 'confidences and secrets' divulged to [the attorney] by [the clients], to the extent they believed they were approaching [the attorney] in a professional capacity with the intent to secure legal advice," and holding as privileged emails "that reflect the purpose of obtaining or providing legal advice for [the client], as well as the parties' expectation of confidentiality") (internal citations omitted).

Put simply, the government has provided no authority for the proposition that a U.S. person such as Ms. Bronfman may not confidentially seek legal advice about the options for bringing a loved one to the United States.

Finally, in an attempt to get access to the privileged attorney-client communications related to M.F.'s immigration status and visa applications,[4] the government makes the baseless suggestion that crime-fraud should vitiate the privilege over these documents, although even the government hesitates to argue this outright, and for good reason. The government has identified

---

[4] The reason for the government's intense interest in the documents related to M.F.'s immigration status—and narrow view of the privilege in this context—is explained by Footnote 2 to its brief, in which the government alleges that M.F. had been living in Albany for nearly a decade as part of the NXIVM community "and as an intimate partner of Raniere" and that she "gave birth to Raniere's child" in August 2017. Defendant submits that the prosecution team's assertion that there is no privilege as to these documents has more to do with their desire as advocates to see the documents than a straightforward assessment of legal issues related to attorney-client privilege. It is for this reason that defendant has argued, and continues to assert, that the taint team, not the prosecution team, should be litigating issues of privilege, untainted by the prosecution team's interest as adversaries in obtaining documents relevant to issues in their case teams pose a serious risk to holders of privilege, and this supposition is substantiated by past experience. . . .").

13

no fraud, nor even a suggestion of fraud or a crime, in the documents related to M.F.'s immigration issues.

In order to meet the standard for crime-fraud, the government must show "(1) probable cause to believe that a fraud or crime has been perpetrated, and (2) probable cause to believe that the communications at issue were in furtherance of and intended to facilitate the fraud or crime." *Aiossa v. Bank of Am., N.A.*, No. 10-CV-01275, 2011 U.S. Dist. LEXIS 102207, at *17 (E.D.N.Y. Sep. 12, 2011); *see also In re Okean B.V.*, 60 F. Supp. 3d 419, 432 (S.D.N.Y. 2014) (explaining "the burden of proving the crime-fraud exception is on the entity seeking to defeat privilege.") (emphasis omitted). The government has fallen far short of that burden.

Indeed, the unprivileged documents the government has described and attached to its brief reflect the opposite of a crime or fraud—they show that Bronfman was seeking legal advice from Frontier Solutions about how M.F. could *legally* come to the United States, and exploring the viability of such options. Dkt. 256 at 5-8. Searching fruitlessly for an indication of dishonesty, the government disingenuously suggests at one point in its brief that the real reason M.F. wants to be in the United States is because she is "Raniere's intimate partner" of ten years and the mother of his child, Dkt. 256 at 5, n.2, while on another page suggesting that the fact that Bronfman raised the idea of Raniere and M.F. marrying as a way of obtaining U.S. status for her "was not legitimate" and implies a fraud. Dkt. 256 at 24 and Exhibit 1. The government further asserts that the emails in which Bronfman and Raniere discuss the idea that M.F. could possibly enter the U.S. on an investor visa "evinces a scheme to circumvent the immigration laws and to fraudulently use assets from an estate in probate to 'make [a] gift' to M.F. for use in obtaining an investor's visa." Dkt. 256 at 24. The government's suggestion that using gifted funds to obtain an investor visa evinces a fraudulent scheme is belied by its concession elsewhere in the brief

14

that "the supporting documents for the [M.F. EB-5] petition *reflect that the funds for M.F.'s investment were a gift by Bronfman.*" Dkt. 256 at 8 (emphasis added). It is dishonest for the government to suggest to the Court that an earlier discussion of using funds from an estate of which Raniere was the beneficiary as the source for the money to be put toward an investor visa—which is entirely proper and would have been disclosed to USCIS (as evidenced by the later disclosure of the gift from Bronfman)—is evidence of a crime that should destroy the attorney-client privilege.

> The words of a district court in the Southern District resonate here:
>
> Simply put, the documents fall far, far short of establishing the crime-fraud exception. They do not reveal a fraudulent scheme, or anything close . . . To be sure, if one starts off with the premise. . . that there was a fraudulent scheme afoot, the documents contain stray turns of phrase or factual particulars that can be woven into a broader tale of fraud. But if one starts off with the correct assumption, which is that the burden of proving the crime-fraud exception is on the entity seeking to defeat privilege, the documents are manifestly insufficient to show any such fraud. Therefore, the Court holds, emphatically, that the documents in question remain privileged…

*In re Okean B.V.*, 60 F. Supp. 3d at 432 (S.D.N.Y. 2014) (Engelmayer, J.).

Finally, the government's assertion that Frontier "was used in an effort to fraudulently obtain a visa for M.F." as demonstrated by the purportedly false statement in Frontier's letter that M.F. "had no intent to immigrate to the United States" does not withstand scrutiny. Dkt. 256 at 24-25. In the immigration context, the analysis of whether an individual possesses an "intent to immigrate" focuses on the individual's intentions as they relate to a specific entry into the United States. Provided the person intends to comply with the terms of her temporary admission to the country, that person lacks an "intent to immigrate"—regardless of whether she harbors a long-term interest in residing in the United States. *See* Dept. of State, 9 Foreign Affairs Manual § 401.1-3(F)(2)(e)), ("a non-immigrant may nonetheless be allowed to enter

15

the U.S. on a temporary basis while the immigrant visa application remains pending"); *see also Matter of Hosseinpour*, 15 I. & N. Dec. 191, 1975 BIA LEXIS 63 (B.I.A. March 5, 1975); *In re H--- R,* 7 I. & N. Dec. 651, 1958 BIA LEXIS 5 (Regional Comm'r, I. & N. Serv. February 18, 1958) (a desire to obtain permanent residence in the future, by itself, does not automatically disqualify an alien from admission as a nonimmigrant).

There is nothing remotely criminal or improper about exploring legal options to obtain legal status to come to the United States—or about discussing the pros, cons, and likelihood of success of each of the options. It is the bread and butter of immigration lawyers—U.S. citizens seeking legal advice from U.S. lawyers regarding their family members or loved ones who want to come to the U.S. and exploring which options are feasible and which are not. That is exactly what is at issue here, and the government has identified no basis to overcome the privilege.

**B. Communications with Attorneys Duran and Olmedo**

As previously indicated the burden of proving a crime-fraud exception is on the party seeking disclosure to show both probable cause to believe that a crime has been perpetrated, and probable cause to believe that the communications at issue were in furtherance of and intended to facilitate the crime." *Aiossa*, No. 10-CV-01275, 2011 U.S. Dist. LEXIS 102207, at *17 (E.D.N.Y. Sep. 12, 2011). Courts do not take this burden lightly stating that "findings that would deprive the client of that protection [of the attorney-client privilege] should be based on an adequate record and bear some assurance of reliability." *Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 358 (E.D.N.Y. 2009) (quoting *In re Omnicom Grp. Inc., Sec. Litig.,* 233 F.R.D. 400, 404 (S.D.N.Y. 2006)).

The government has failed to meet its burden, not citing to any specific crime or fraud that would invoke this exception. Rather the government summarily states the law of the crime-

16

fraud exception and references a series of events regarding how Ms. Bronfman and Mr. Raniere allegedly "were alerted to the fact that DOS would shortly be publicly disclosed by The New York Times" and then drafted letters that "threat[ened] criminal prosecution." Dkt. 256 at 26-27. In that vein, the government notes that one of the means and methods of the conspiracy charged in the Superseding Indictment is allegedly "using harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics" of Raniere. Dkt 256 at 10.

      Even if the Court were to take these factual allegations as true, the government has failed to articulate the crime implicated. Defendants are left to defend the sanctity of the attorney-client relationship without any clear indication of the crime they are defending against. It is not enough to merely summarily discuss a series of events that the government believes creates a reasonable suspicion of a crime. *Aiossa*, No. 10-CV-01275, 2011 U.S. Dist. LEXIS 102207, at *18 (E.D.N.Y. Sep. 12, 2011). Nor is the government's belief that the sought-after evidence would support its case as to one of the alleged means and methods of the conspiracy sufficient to establish probable cause of a crime – first of all, "means and methods" of a conspiracy are not necessarily crimes, and secondly, "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Instead, the exception applies only when the court determines that the client communication . . . in question was *itself* in furtherance of the crime or fraud." *Nuss v. Sabad*, 976 F. Supp. 2d 231, 244 (N.D.N.Y. 2013) (quoting *In re Richard Roe, Inc.*, 68 F.2d 38, 40 (2d Cir. 1995) (internal citations and quotation marks omitted). To the extent that the government tries to suggest that the activities involving Duran and Olmedo were an effort to interfere with a criminal investigation in the United States, that is simply false. At the time of the communications in question, there was no investigation in the United States.

17

The communications the movant is seeking to have disclosed must also have been in furtherance or to facilitate the crime alleged, and the government has failed to meet this burden. The government has included as exhibits several communications among Ms. Bronfman, Mr. Raniere, and NXIVM attorneys in Mexico.[5] These documents show that individuals affiliated with NXIVM were seeking the advice of counsel in Mexico for crimes or civil wrongs that may have been committed against the company in Mexico. The Second Circuit has cautioned "that the attorney-client privilege . . . play[s] a critical role in our judicial system, . . . [and] the limited exceptions to [it] . . . should not be framed so broadly as to vitiate much of the protection [it] afford[s]." *United States v. Richard Roe, Inc. (In re Richard Roe, Inc.)*, 168 F.3d 69, 71 (2d Cir. 1999). In particular, "[w]here the very act of litigating is alleged as being in furtherance of a fraud, the party seeking disclosure under the crime-fraud exception must show probable cause that the litigation or an aspect thereof had little or no legal or factual basis and was carried on substantially for the purpose of furthering the crime or fraud." (finding that the crime-fraud exception did not apply where "the defense of the underlying litigation hardly lacked any legal or factual basis.") *Id.* at 71-72. Simply consulting an attorney to determine the possible legality of a particular course of action is hardly enough to pierce the attorney-client confidences. *Nuss*, 976 F. Supp. 2d at 245 (N.D.N.Y. 2013) ("even if one presumes a fraudulent purpose as to the events [], the mere fact that Defendants discussed those events with an attorney in the course of soliciting legal assistance in a dispute arising from those events does not give rise to an inference that any legal assistance they sought was for a fraudulent purpose."). The government does not

---

[5] The government does not address why or how it reached the determination on its own that an email Mr. Raniere drafted and apparently intended to be passed along to company counsel through Ms. Bronfman is not itself privileged.

18

even attempt to meet the burden it must overcome to show that defendants' consultation with attorneys to redress grievances are not entitled to the protection of the privilege.[6]

Finally, the government's motion is insufficiently particular and is premature. The Court cannot possibly rule on crime-fraud related to this course of events based on the prosecution team's insufficient articulation of what communications it is looking to obtain and why it is entitled to obtain them.

## CONCLUSION

For the reasons described herein and upon our prior submissions, as well as the reasons set forth in non-party NXIVM's response to the government's motion, we respectfully request that the Court deny the government's request for an Order invalidating Bronfman's and NXIVM's privileges.

Dated: January 11, 2019
New York, NY

Respectfully submitted,
HAFETZ & NECHELES LLP

By: _____/s/_____
Susan R. Necheles
Kathleen E. Cassidy
10 East 40th Street, 48th Floor
New York, NY 10016

*Attorneys for Defendant
Clare Bronfman*

---

[6] Defendant joins in the arguments of counsel for NXIVM in support of NXIVM's assertion of attorney-client privilege.

19