UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -  v. -

KEITH RANIERE, CLARE BRONFMAN,
ALLISON MACK, KATHY RUSSELL,
LAUREN SALZMAN, and NANCY SALZMAN,

            Defendants.

No. 18-cr-204 (NGG)

**ORAL ARGUMENT REQUESTED**

**Date of service:  January 9, 2019**

## SEALED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CLARE BRONFMAN, KATHY RUSSELL, AND NANCY SALZMAN'S <u>MOTION TO SEVER</u>

Justine Harris
Amanda Ravich
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant Kathy Russell*

David Stern
Robert Soloway
Rothman, Schneider, Soloway & Stern, LLP
100 Lafayette Street, Suite 501
New York, New York 10013
(212) 571-7700

*Attorneys for Defendant Nancy Salzman*

Alexandra A.E. Shapiro
Fabien M. Thayamballi
Shapiro Arato LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

Susan Necheles
Kathleen E. Cassidy
Hafetz & Necheles LLP
10 East 40th Street, 48th Floor
New York, New York 10016
(212) 997-7400

*Attorneys for Defendant Clare Bronfman*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    The Superseding Indictment ................................................................. 3

    B.    The Government's Disclosures Concerning The Charges Against
          The Non-DOS Defendants ................................................................... 6

    C.    The Government's Disclosures Concerning The Charges Against
          The DOS Defendants ........................................................................... 8

    D.    The Government's Disclosures Concerning Raniere's Other Alleged Acts......... 14

ARGUMENT ...................................................................................................................... 15

I.    THE NON-DOS DEFENDANTS' TRIAL SHOULD BE SEVERED FROM
    THE TRIAL OF THE OTHER DEFENDANTS............................................................. 15

    A.    The Inflammatory DOS Allegations Will Severely Prejudice The
          Non-DOS Defendants In A Joint Trial ................................................. 15

    B.    The Joint Trial Date Will Prejudice The Non-DOS Defendants ......................... 23

II.    THE NON-DOS DEFENDANTS MAY BE MISJOINED WITH THE
    OTHER DEFENDANTS IF THE COURT GRANTS IN PART THEIR
    MOTION TO DISMISS ............................................................................................ 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) .......................................................................................... 22

*Coleman v. Superior Court*,
   116 Cal. App. 3d 129 (Cal. Ct. App. 1981) ............................................... 21

*Krulewitch v. United States*,
   336 U.S. 440 (1949) .......................................................................................... 20

*People v. Robinson*,
   340 N.W.2d 631 (Mich. 1983) ....................................................................... 21

*United States v. Cook*,
   No. 3:17-CR-00065 (SRU), 2018 WL 2303016 (D. Conn. May 21, 2018) ............................ 25

*United States v. Dowtin*,
   No. 10-CR-657 SJ RML, 2012 WL 7679552 (E.D.N.Y. Nov. 20, 2012) ................... 19, 20, 24

*United States v. Estrada*,
   430 F.3d 606 (2d Cir. 2005) ........................................................................... 21

*United States v. Figueroa*,
   618 F.2d 934 (2d Cir. 1980) ........................................................................... 25

*United States v. Gallo*,
   668 F. Supp. 736 (E.D.N.Y. 1987) ............................................... 17, 18, 21, 24

*United States v. Ganias*,
   824 F.3d 199 (2d Cir. 2016) ........................................................................... 26

*United States v. Green*,
   523 F.2d 229 (2d Cir. 1975) ........................................................................... 17

*United States v. Guillen-Rivas*,
   950 F. Supp. 2d 446 (E.D.N.Y. 2013) ......................................................... 16

*United States v. Kouzmine*,
   921 F. Supp. 1131 (S.D.N.Y. 1996) ............................................................. 28

*United States v. Lucas*,
   17 F.3d 596 (2d Cir. 1994) ............................................................................. 17

*United States v. Maisonet*,
   No. S3 97 CR. 0817 (DC), 1998 WL 355414 (S.D.N.Y. July 1, 1998) ............................ 19, 24

*United States v. Romano*,
   684 F.2d 1057 (2d Cir. 1982) ......................................................................................... 17

*United States v. Sherman*,
   No. 1:10CR00039, 2011 WL 11186 (W.D. Va. Jan. 4, 2011).................................... 21

*United States v. Spicer*,
   No. 10-CR-657 SJ RML, 2013 WL 871952 (E.D.N.Y. Mar. 7, 2013) .................... 19

*United States v. Spoor*,
   904 F.3d 141 (2d Cir. 2018) ......................................................................................... 22

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) .................................................................................... 20

*United States v. Walsh*,
   700 F.2d 846 (2d Cir. 1983) ......................................................................................... 17

*Zafiro v. United States*,
   506 U.S. 534 (1993)........................................................................................... 16, 17, 25

**Rules**

Fed. R. Crim. P. 14(a)........................................................................................................ 16

Fed. R. Crim. P. 8(b).......................................................................................................... 25

## PRELIMINARY STATEMENT

It is impossible for Clare Bronfman, Kathy Russell, and Nancy Salzman to obtain a fair trial if they are tried together with the other Defendants. The allegations against Keith Raniere, Allison Mack, and Lauren Salzman are so sensational and inflammatory—and so different in kind from the allegations against Bronfman, Russell, and Nancy Salzman—that unfair prejudice to Bronfman, Russell, and Nancy Salzman is inevitable unless the two groups are severed and tried separately.

This prosecution began as a case about DOS. In a criminal complaint and the first indictment, the government alleged that Keith Raniere, assisted by Allison Mack, engaged in sex trafficking and forced labor by luring young women into DOS and using the "collateral" they provided to extort sex and other services. The complaint told a lurid tale of female "slaves" who were branded with a cauterizing iron, forced to turn over assets and blackmail material, coerced into providing sex and labor, and punished for disobedience.

In its bail filings and other submissions, the government portrayed Raniere and Mack as sadistic and sexually depraved criminals who reveled in the physical and psychological torture of vulnerable victims. The government recounted Raniere's purported "decades' long history" of "sexual assault and other abuse of girls and women," including his alleged sex with twelve- and fifteen-year-old girls, his alleged "physical assault" of "at least two intimate partners," and his alleged teachings justifying "incest" and "gang rape." The government alleged that Mack's "slaves" were kept "sleep-deprived and emaciated to the point where they stopped menstruating" because, to satisfy Raniere's sexual appetite, the women had to be "extremely thin" (with "a lot of pubic hair"). It further alleged that, during the ceremonies in which Mack's slaves were branded with a cauterizing iron, she told them to "feel the pain" as they cried in anguish.

Then, the superseding indictment was returned, and the case gained a completely different dimension. Bronfman, Russell, and Nancy Salzman were joined as defendants and charged with bland white-collar offenses that had nothing to do with DOS. None of these three Defendants were even alleged to have known about DOS or any of the sensational allegations being lodged against the other Defendants. Lauren Salzman was charged for her alleged participation in DOS and other alleged acts of coercion. All of the Defendants were joined in a single RICO conspiracy based on the flimsy theory that their conduct related in some way to Raniere or his company, NXIVM. But the Defendants broke down neatly into two groups: (1) Bronfman, Russell, and Nancy Salzman, who had no involvement in DOS (the "Non-DOS Defendants"), and (2) Raniere, Mack, and Lauren Salzman, who allegedly were the key players in DOS.

There is no legitimate justification for trying these two groups together. A joint trial will focus overwhelmingly on DOS, tainting the Non-DOS Defendants with shocking allegations that have nothing to do with them but will almost certainly poison the jury against everyone sitting at the defense table. The media has already labeled this prosecution the "sex cult" case precisely because it knows this is the most attention-grabbing aspect. The DOS-related allegations are likely unfair or false—by repeating them, we do not mean to suggest otherwise—and the Defendants allegedly involved in DOS are fully entitled to a fair trial before an unbiased jury. But jurors are human, and the Non-DOS Defendants cannot afford to gamble years in prison on the jury's ability to put aside their prejudices and consider each Defendant as an individual. Just as courts have severed other defendants in RICO conspiracy cases because the charges against them paled in comparison to the charges against their co-defendants, the Court should sever the Non-DOS Defendants and try them separately to ensure a fair result.

# BACKGROUND

## A.    The Superseding Indictment

As explained in the Non-DOS Defendants' motion to dismiss (Dkt. 194), the Indictment[1] draws two related and critically important distinctions.  The first is between NXIVM, a legitimate business involving all of the Defendants, and DOS, a secret society involving Raniere, Mack, and Lauren Salzman.  (*Id.* at 3-6).  The second is between the Non-DOS Defendants, on the one hand, and Raniere and the "DOS Defendants" (Mack and Lauren Salzman), on the other.  (*Id.* at 6-8).  While all Defendants are charged in a single RICO conspiracy, these two groups are charged with vastly different offenses.  (*Id.* at 9-11).  These differences are crucial, and they warrant reiteration here:

1.    *Alleged participants.*  Count One, the alleged RICO conspiracy, is the only count that joins all of the Defendants.  This count alleges that Raniere was the leader of the enterprise and charges him in many of the predicate acts of racketeering.  (SI ¶¶ 7, 17-23, 26-30, 34).  However, the Indictment does not charge any predicate acts that the Non-DOS Defendants and the DOS Defendants supposedly committed together:

|  | DOS Defendants | | | Non-DOS Defendants | | |
|---|---|---|---|---|---|---|
|  | Mack | L. Salzman | Raniere | Bronfman | Russell | N. Salzman |
| Act 1-A |  |  | X |  | X |  |
| Act 1-B |  |  | X |  | X |  |
| Act 2-A |  |  | X | X | X | X |
| Act 2-B |  |  | X |  | X |  |
| Act 2-C |  |  | X | X |  |  |
| Act 3 |  |  | X |  |  | X |
| Act 4 |  |  | X |  |  |  |
| Act 5-A |  |  |  | X |  |  |
| Act 5-B |  |  |  | X |  |  |
| Act 6-A |  | X | X |  |  |  |
| Act 6-B |  | X | X |  |  |  |
| Act 7 | X | X | X |  |  |  |

---

[1] We refer to the Superseding Indictment (Dkt. 50) as the "Indictment" and cite it as "SI."

|  | DOS Defendants | | Raniere | Non-DOS Defendants | | |
|---|---|---|---|---|---|---|
|  | Mack | L. Salzman | | Bronfman | Russell | N. Salzman |
| Act 8-A | X | | X | | | |
| Act 8-B | X | | X | | | |
| Act 8-C | X | | | | | |
| Act 9-A | | X | | | | |
| Act 9-B | | X | | | | |
| Act 10 | | | X | X | | |

(SI ¶¶ 17-34).  In fact, nearly every predicate act was allegedly committed either by a single Defendant or by Raniere and one other Defendant.  The Indictment alleges only two exceptions: a conspiracy involving Raniere and all of the Non-DOS Defendants (SI ¶ 19 (Act 2-A)) and an extortion charge involving Raniere and all of the DOS Defendants (SI ¶ 28 (Act 7)).  But again, neither of these charges links the Non-DOS Defendants to the DOS Defendants.

Nor are the DOS Defendants and Non-DOS Defendants charged together in the non-RICO counts.  Raniere and DOS Defendants are charged in Counts Two through Six (the "DOS Counts").  Only Raniere and Bronfman are charged in Count Seven (the "Non-DOS Count").  Neither Russell nor Nancy Salzman is charged in any count other than the RICO conspiracy.

Significantly, the government has conceded that venue is lacking for Count Seven and that the charged Defendants, Raniere and Bronfman, cannot be tried on that count in this District. (Dkt. 248 at 56; Dkt. 257 at 18).  As a result, other than Count One, there is no other count that joins the Non-DOS Defendants with any other Defendant.

2.    *Nature of the charged offenses.*  The DOS and Non-DOS Defendants are also charged with committing starkly different types of crimes.  In the RICO count, the Indictment alleges that the DOS Defendants, sometimes in concert with Raniere, engaged in acts of sex trafficking, forced labor, and extortion against specific victims or, more generally, "lower-ranking DOS members."  (SI ¶¶ 28 ("lower-ranking DOS members"), 26-27 (Jane Doe 4), 29-33

(Jane Does 5 and 6)). We refer to these predicate acts as the "DOS Acts" (Acts 6 through 9).[2] Similarly, the DOS Counts charge the DOS Defendants with a forced labor conspiracy, a fraud conspiracy, and sex trafficking crimes against "lower-ranking DOS members" and specific victims. (SI ¶¶ 35-37 ("lower-ranking DOS members"), 38-39 (Jane Does 5 and 8)).

The Non-DOS Defendants, in stark contrast, are charged with various offenses that have nothing to do with the alleged sex trafficking, forced labor, or extortion of DOS members (or anyone else). The RICO count alleges that the Non-DOS Defendants committed predicate acts of identity theft, sometimes for the purpose of evading immigration laws, sometimes to intercept communications, and sometimes to evade taxes; altering records for use in litigation; encouraging the illegal entry of an alien; and money laundering. These offenses are not alleged to have any connection to DOS or to have furthered the DOS Acts in any way. Indeed, the Non-DOS Defendants are not alleged even to have known about DOS. And none of the alleged victims of these offenses appear in any predicate act involving the DOS Defendants. (SI ¶¶ 17-22 (Jane Doe 1, John Does 1 and 2), 24-25 (Jane Doe 3), 34 (Jane Doe 7)). We refer to these acts as the "Non-DOS Acts" (Acts 1, 2, 3, 5, and 10).[3] Moreover, the sole Non-DOS Count is virtually identical to the identity theft conspiracy charged in Act 10. (SI ¶¶ 34, 40).

3.    *Time and place.* The Non-DOS Defendants are also charged with committing offenses in different locations from the DOS Defendants. All of the alleged Non-DOS Acts and the Non-DOS Count occurred in the Northern District of New York or the District of New Jersey. None of them occurred in the Eastern District of New York. (SI ¶¶ 17-22, 24-25, 34, 40;

---

[2] While Act 6 allegedly predated the existence of DOS, we refer to it as a DOS Act because the charged offenses and Defendants resemble those in other alleged DOS Acts.

[3] There is also a single, separate predicate act (Act 4) charging Raniere alone with conspiring to commit identity theft. (SI ¶ 23). None of the other acts involve the alleged victim, Jane Doe 2.

*cf. id.* ¶ 23).  By contrast, all of the DOS Counts and all but one of the DOS Acts are alleged to have occurred in the Eastern District.  (SI ¶¶ 28-33, 35-39).  The sole exception is Act 6, which occurred in the Northern District.  (SI ¶¶ 26-27).

The charged offenses also allegedly occurred *years* apart from each other.  Other than Act 6 (SI ¶¶ 26-27), all of the DOS Counts and DOS Acts occurred between 2015 and 2017 (SI ¶¶ 28-33, 35-39).  Most of the Non-DOS Acts, however, occurred many years earlier, from 2004 to 2009 (SI ¶¶ 17-21, 24-25), and others continued later, into 2018 (SI ¶¶ 22, 34, 40).

### B.    The Government's Disclosures Concerning The Charges Against The Non-DOS Defendants

As the government has conceded, the Non-DOS Defendants did not participate in DOS or even *know* about it at the time of the charged offenses.  (Dkt. 194 at 3, 20-21; Dkt. 257 at 15-16).  In its submissions to the Court, the government has confirmed that its allegations against the Non-DOS Defendants involve plain-vanilla, non-violent offenses wholly unrelated to the DOS Acts.[4]

**Act 1:**  Raniere and Russell are "alleged to have conspired to commit identity theft and to have conspired to unlawfully possess a false identification document.  These predicate acts [allegedly] arise out of a scheme . . . to smuggle an alien into the United States through Canada after the alien was denied legitimate entry into the United States.  Russell [allegedly] drove from Albany, New York to Toronto, Canada where she met the alien and provided her with an identification card bearing the last name and birthdate of a woman who had recently died.  [Allegedly,] [u]sing the false identification, the alien was granted entry into the United States and

---

[4] Throughout this motion, we summarize the government's disclosures for the sole purpose of explaining the allegations the government intends to prove at trial and to argue to the jury.  We dispute these allegations and will do so at trial, and our summary of the allegations from the various government filings is intended to be neither a concession nor an acknowledgment that any of the allegations are accurate.

6

Russell drove her to Clifton Park, New York, where many members of Nxivm including Raniere lived." (Dkt. 52 at 3 (July 24, 2018 bail letter)).

**Act 2:** Raniere, Bronfman, Russell, and Nancy Salzman are "alleged to have conspired to commit identity theft and to have committed identity theft. These predicate acts [allegedly] arise out of a scheme to obtain usernames and passwords of people believed to be Nxivm's enemies so their emails could be monitored by the Enterprise." (*Id.* at 2).

**Act 3:** Raniere and Nancy Salzman allegedly engaged in "a scheme to alter records for use in an official proceeding. Th[e] predicate act stems from a lawsuit Nxivm filed against a cult deprogrammer and a former student, among others. The former student countersued alleging various consumer perception claims stemming from Nxivm's curriculum. In discovery, Nxivm was ordered to produce videos of Nancy Salzman teaching courses the student had taken. [Allegedly,] Nxivm opposed this request initially but eventually relented and claimed to have provided "unedited" copies of the videos. [Allegedly], co-conspirators, including Nancy Salzman, agreed to edit the videos to remove material that they believed would have supported the former student's claims and to make it look as if the videos were unedited." (*Id.* at 4).

**Act 5:** "Bronfman is alleged to have encouraged and induced the illegal entry of an alien for Bronfman's financial gain and to have committed money laundering in order to facilitate that crime. Bronfman [allegedly] engaged in international wire transfers to make it fraudulently appear as if the [foreign national] had the financial resources to obtain an investor visa when in fact [she] did not." (*Id.* at 3).

**Act 10 and Count Seven:** Raniere and Bronfman are "alleged to have conspired to commit identity theft. Bronfman [allegedly] engaged in a monthly practice of facilitating Raniere's use of a dead person's credit card account by arranging to pay the monthly credit card

bill using the dead person's bank account.  Raniere [allegedly] used this credit card account as part of a scheme to avoid paying taxes by keeping his assets in the name of others." (*Id.* at 3). "The expenses charged to the woman's credit card after her death [allegedly] included payments to a chiropractor for Raniere's benefit, as well as thousands of dollars' worth of clothing and shoe purchases for the mother of Raniere's child." (*Id.* at 7).

### C.   The Government's Disclosures Concerning The Charges Against The DOS Defendants

By contrast, the charges against the DOS Defendants, and the related charges against Raniere, are extremely disturbing and sensational in nature.  As explained above, Raniere, Mack, and Lauren Salzman are charged with predicate acts and separate counts of forced labor, forced labor conspiracy, extortion, and wire fraud conspiracy.  Raniere and Mack are also charged with sex trafficking, attempted sex trafficking, and sex trafficking conspiracy, and Raniere and Lauren Salzman are also charged with document servitude and trafficking for labor and services.  (SI ¶¶ 26-33, 35-39).  Virtually all of these charges concern the same alleged scheme related to these Defendants' alleged participation in DOS.  According to the government:

> [T]hese charges arise from . . . a secret society called "DOS" or "The Vow," in which women were recruited to be slaves under the false pretense of joining a women-only mentorship group.  DOS is structured as a pyramid with [Raniere] at the top.  To join DOS, slaves were required to provide their masters with "collateral," which included highly damaging information about themselves and/or family members, naked photographs and rights to their assets.  Once they had joined, slaves learned they had to provide additional collateral, which they did, fearing that otherwise the collateral they had already provided would be used against them.  None of the slaves (except for those directly under [Raniere]) knew that [Raniere] was involved in the organization when they were recruited.

> DOS slaves understood that if they told anyone about DOS, if they left DOS or if they failed to complete assignments given to them by their masters, their collateral could be released.  A number of DOS slaves . . . were given assignments that implicitly or expressly directed them to have sex with [Raniere].  Moreover, a number of DOS slaves . . . performed services other than sex (such as editing [Raniere's] articles and transcribing interviews) for the benefit of [Raniere], believing that if they did not, their collateral could be released.  The

8

masters who gave these assignments received the financial benefit of free labor from their slaves.  Many DOS slaves were also groomed for sex with [Raniere] by (1) being ordered to adhere to very restricted diets ([Raniere] is known to sexually prefer extremely thin women), (2) being ordered to remain celibate ([Raniere] has taught that women should be monogamous but that men are naturally polyamorous), and/or (3) being ordered to stop waxing or shaving their pubic hair ([Raniere] is known to sexually prefer women with a lot of pubic hair).  The slaves were told that they were being given these orders to benefit themselves.  The DOS masters who directed their slaves to have sex with [Raniere] received financial benefits in the form of continued status and participation in DOS, as well as financial opportunities from [Raniere].

DOS slaves were seriously sleep-deprived from participating in "readiness" drills, which required them to respond to their masters any time day or night.  DOS slaves were also branded in their pelvic regions with a cauterizing pen with a symbol that, unbeknownst to them, incorporated [Raniere's] initials.

The government estimates that [Raniere] has had more than fifty DOS slaves under him.

(Dkt. 4 at 1-2 (March 26, 2018 bail letter regarding Raniere); *see also* Dkt. 1 ¶¶ 11-57 (Complaint); Dkt. 17 at 1-2 (April 20, 2018 bail letter regarding Mack); Dkt. 52 at 4, 6-7 (July 24, 2018 bail letter regarding Lauren Salzman)).

On the subject of "collateral," the government alleges that "[c]ollateral provided by prospective slaves included sexually explicit photographs; videos made to look candid in which the prospective slaves told damning stories (true or untrue) about themselves, close friends and/or family members; and letters making damaging accusations (true or untrue) against friends and family members."  (Dkt. 1 ¶ 16 (Complaint)).  Examples allegedly included "(1) a letter regarding [the slave's] mother and father that would 'destroy their character'; (2) a contract that transferred custody of any children birthed by [her] to R[aniere] if [she] broke her commitment to R[aniere]; (3) a contract that transferred ownership of [her] home if the commitment to R[aniere] was broken; and (4) a letter addressed to social services alleging abuse to [her] nephews."  (*Id.* ¶ 37).  The government further alleges that after joining DOS, "[s]ome slaves

were told that they had to collateralize all aspects of their lives, including signing over any assets, disclaiming their faith, and doing things that would ruin their careers and relationships if the collateral were released." (*Id.* ¶ 18).  According to the government, "[a]ll DOS slaves were ultimately required to provide collateral beyond what had initially been described to them," and most "were not initially told that they would have to provide collateral every month." (*Id.* ¶ 19).

The government alleges that "[s]laves were chastised and punished for not performing sufficient acts of care [for their masters], and slaves believed that if they repeatedly failed at acts of care they risked release of their collateral." (*Id.* ¶ 21).  Allegedly, they "had to engage in acts of self-denial or acts that would cause them discomfort, including taking ice cold showers for several minutes, standing for an hour at 4:00 a.m. and performing planks." (*Id.* ¶ 27). "Furthermore, masters [allegedly] informed their slaves that if the slaves failed to complete their assignments, it reflected badly on the masters and could cause them to be punished by their own masters." (*Id.* ¶ 29).  For example, one master allegedly "told her slaves that she could be punished by being paddled or by being put in a cage by her master, i.e. by R[aniere], for her slaves' failure to succeed at 'readiness.'" (*Id.*). █████████████████ ████████████████████████████████████████████ ████████████████

The government has alleged at least one specific example of DOS-related sex in great detail.  Raniere allegedly "blindfolded" a DOS slave, "directed her to remove all her clothes," led her to "a shack," and "tied her to a table." (*Id.* ¶ 45).  Allegedly, "[a]nother person in the room, who[m] [the slave] did not previously know was present, began performing oral sex on [her] as R[aniere] circled the table making comments." (*Id.*).  The purported slave allegedly "did not

want to participate in this sexual activity, but believed it was part of her commitment to DOS and

that if she broke her commitment to DOS her collateral could be released." (*Id.*).

The government also claims to have several messages and emails sent between Raniere

and alleged DOS slaves, including the following:

- RANIERE:  I think it would be good for you to own a fuck toy slave for me, that you could groom, and use as a tool, to pleasure me…

- RANIERE:  Find a life slave and I'll tell you everything…
  [DOS Slave]:  What do you mean by life slave?
  RANIERE:  Someone who has a collateralized vow with you for life…

- RANIERE:  I feel badly each time you have to work hard for me to [orgasm]… I thought slaves could remove the burden…and I could get you fresh and not worn

- RANIERE:  [H]aving one or two young slaves devoted to revving my body sexual to produce more energy would help.  It would be there [sic] 24/7 job…

- RANIERE:  Your greatest joy is to surrender completely all things, in all ways, without reservation, completely exposed, to your Master and Master's will.  The best slave derives the highest pleasure from being her Master's ultimate tool, independent of use: by joyously offering all your decisions to be made, or used, by your Master, you surrender your life, mind, body and possessions for unconditional use.

  That your Master has your time and labor allows for more production; that your Master has your vote allows for more potency.  By recruiting others within your power you honor and increase your Master's power.

(Dkt. 44 at 3-6 (June 8, 2018 bail letter regarding Raniere); Dkt. 202 at 4-5 (November 19, 2018

bail letter regarding Raniere)).

The government alleges that Mack "aggressively recruited DOS slaves and required those

slaves to recruit slaves of their own," and that she "was focused on recruiting attractive young

women who could meet Raniere's sexual preferences."  (Dkt. 17 at 3).  Allegedly, "[Mack's]

slaves were kept seriously sleep-deprived and emaciated to the point where they stopped

menstruating."  (*Id.*).  According to the government, "[d]uring the ceremonies in which her

slaves were branded, [Mack] placed her hands on the slaves' chests and told them to 'feel the

pain' and to 'think of [their] master,' as the slaves cried with pain." (*Id.*).  And allegedly, DOS "[m]asters told their slaves after the branding ceremonies that the videos of the branding ceremonies and photographs of the women with their brands were additional pieces of collateral." (Dkt. 1 ¶ 31).  In addition, the government alleges that Mack "regularly required her slaves to pose for nude photographs, including on one occasion close-up pictures of their vaginas,"[5] would send these photographs to Raniere, and would "relay . . . [his] responses[,] includ[ing] that the photographs were not graphic enough or that the slaves were not smiling enough, and that they had to be retaken." (Dkt. 1 ¶ 48).

The government alleges that Lauren Salzman was a "first line master in DOS" who "obtained property and services from her slaves based on material lies and omissions and through extortion." (Dkt. 52 at 4).  The government claims to "possess[] significant electronic evidence corroborating witness accounts of her involvement as well as bank account authorizations and sexually explicit photographs and videos that were provided to Lauren Salzman based on lies or extortion." (*Id.* at 7).

The predicate acts of document servitude and labor trafficking charged against Lauren Salzman and Raniere relate to a separate alleged incident that predated DOS, but that the government alleges is linked to Raniere's sexual relationship with the alleged victim.  (SI ¶¶ 26-27).  According to the government:

> [These charges] stem from years of abuse of an illegal alien living in Clifton Park, New York who was at one time a member of Raniere's inner circle and a sexual partner of Raniere's, in part to extract work from her.  Eventually the victim was confined to a room as punishment after she developed romantic feelings for a man

who was not Raniere.  The victim had only sporadic visitors, including Lauren Salzman, who were tasked with "helping" the victim heal her "ethical breach" with Raniere.  The victim was told that if she left the room she would be sent to Mexico without any identification documents.

While in the room the victim went for months-long stretches without any human contact.  After nearly two years in the room, the victim left the room, and, as threatened, she was driven to Mexico without any identification documents.[6]  Once in Mexico, the victim repeatedly reached out to her family by email for help with her identification documents.  Her family was instructed by co-conspirators, including Lauren Salzman, not to send the victim her documents and co-conspirators, including Lauren Salzman, directed the family to respond to the victim by demanding the victim resume performing services for the members of the Enterprise in order to see her family again.  Indeed certain members of the victim's family did not speak to her again for many years.
. . .
For instance, on February 29, 2012, the victim wrote to her father (a follower of Raniere): "Without my papers I cannot do anything about my visa, at all. I am so sad. I cry every time I am alone. . . . Why wont you send me my papers? . . . i will pay you for sending them if that is what you want. There is nothing I can do without them. . . . I have been trying to survive."  This email was then forwarded to Lauren Salzman and other co-conspirators, and Lauren Salzman agreed with a decision by the group to continue not to send the victim her papers and said in various emails that the victim was "gameplaying" and criticized the victim for having "failed to submit a concise plan" for completing her Nxivm-related work.

(Dkt. 52 at 3-4, 7).

The government further alleges that this woman "received limited medical attention" during her confinement; "[h]er period of confinement was repeatedly extended for other supposed ethical breaches, including, in one instance, because she cut her hair"; and "security cameras . . . were installed outside [her] bedroom in order to ensure she didn't leave."  (Dkt. 4 at 3; Dkt. 44 at 6).  Allegedly, "Lauren Salzman emailed [Raniere] to inform him that [the woman] had written a letter that begged to be 'let out' of the room because she was 'coming undone'"; Salzman informed Raniere that the "letter had been intercepted and was not shown to [the woman's] parents"; and the woman "remained confined to the bedroom for another fifteen

---

[6] Specifically, the government alleges that she was "driven to the Mexican border and ordered to walk across, without money or identification papers."  (Dkt. 52 at 6).

months after she wrote the letter." (Dkt. 202 at 5-6). The government has characterized this incident, and will undoubtedly describe it at trial, as "the psychological torture of a young woman." (Dkt. 44 at 6).

### D.    The Government's Disclosures Concerning Raniere's Other Alleged Acts

The government has also disclosed other allegations concerning Raniere's conduct, which it could potentially seek to introduce at trial. In its bail submissions, the government has alleged that Raniere has a "decades' long history" of "sexual assault and other abuse of girls and women." (Dkt. 4 at 3 (capitalization altered)). The government claims that,

> [a]ccording to confidential sources, the defendant had repeated sexual encounters with multiple teenage girls in the mid-to-late 1980s and early 1990s. In one instance, the defendant met a fifteen-year-old girl while he was in his 20s and had repeated sexual contact with her. In another instance, the defendant met a twelve-year-old girl whose mother worked for the defendant and began tutoring her. Shortly thereafter, the defendant began having regular sexual intercourse with her, including at his home where he lived with multiple adult sexual partners. One of those partners hired the girl to walk her dog, giving the defendant daily access to the girl. The defendant told one of the DOS slaves he had sex with that he believed the age of consent was too rigid and that it should be lowered to when a child's parent says the child is capable of consent.

(*Id.*). The government has further linked some of this alleged conduct to DOS, claiming that it "has obtained evidence that [Raniere] began having a sex with a 'first-line' DOS 'slave' when she was fifteen years old and he was forty-six. Among other sources of evidence, journal entries written by the DOS slave before her eighteenth birthday reflect an ongoing sexual relationship with the defendant." (Dkt. 202 at 5 (footnote omitted)).

14

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

The government also alleges that Raniere "physically assaulted at least two intimate partners and in 2012, under the guise of mentorship, he encouraged a woman to run headfirst into a tree and to drink from a puddle." (Dkt. 4 at 3). According to the government, one organization founded by Raniere "relied on humiliating women in order to eradicate weaknesses the defendant taught were common in women. For example, women attending the classes [allegedly] were forced to wear fake cow udders over their breasts while people called them derogatory names." (*Id.* at 3-4). The government alleges that Raniere "has also posed disturbing hypotheticals as part of the Nxivm curriculum, challenging whether incest and rape are actually wrong. He [allegedly] told one DOS slave that incest is not wrong if the 'victim' is sexually aroused by the experience, and he questioned whether gang rape is bad if the person being raped has an orgasm." (*Id.* at 4).

## ARGUMENT

**I.    THE NON-DOS DEFENDANTS' TRIAL SHOULD BE SEVERED FROM THE TRIAL OF THE OTHER DEFENDANTS**

### A.    The Inflammatory DOS Allegations Will Severely Prejudice The Non-DOS Defendants In A Joint Trial

Bronfman, Russell, and Nancy Salzman will not receive a fair trial if they are tried together with Raniere, Mack, and Lauren Salzman. The allegations and purported evidence against these two groups of Defendants are so different in kind, and in their likely effect on the

---

[7] In no way do we mean to suggest that these inflammatory materials could or should be admitted at a trial of any of the Defendants.

jury, that these two groups should be severed and tried separately, even though they are joined in a single RICO conspiracy count. Indeed, several courts have severed the trials of alleged RICO conspirators, and the circumstances of this case are so egregious as to warrant the same result.

The Court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). In particular, severance is warranted where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Courts in this Circuit have articulated several non-dispositive factors to consider when evaluating the propriety of severance, including:

> (i) the number of defendants and counts; (ii) the complexity of the indictment; (iii) the estimated length of trial; (iv) disparities in the amount or type of proof offered against the defendants; (v) disparities in the degrees of involvement by defendants in the overall scheme; (vi) possible conflict between defense theories or strategies; (vii) potential prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant; and (viii) potential prejudice if exculpatory evidence were unavailable in a joint trial, but would have been available to a defendant tried alone.

*United States v. Guillen-Rivas*, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013) (citing cases).

The risk of prejudice is heightened, and severance is particularly appropriate, "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of [alleged] culpability." *Zafiro*, 506 U.S. at 539. Even within a RICO conspiracy count, there may be "serious concerns about the prejudice that would result to [certain defendants] in light of the nature and magnitude of the allegations . . . involving only [their co-defendants]," such as where those allegations involve "activities of a violent nature." *United States v. Asaro*, No. 14-cr-26 (ARR) (E.D.N.Y. Aug. 21, 2014), ECF No. 124 at 4-5 (severance order). Indeed, it is not

16

uncommon for district courts to sever the trials of RICO defendants. *See, e.g.*, *United States v. Lucas*, 17 F.3d 596, 598-99 (2d Cir. 1994); *United States v. Walsh*, 700 F.2d 846, 851 & n.1 (2d Cir. 1983); *United States v. Romano*, 684 F.2d 1057, 1059 (2d Cir. 1982); *United States v. Green*, 523 F.2d 229, 231 n.2 (2d Cir. 1975). While every case implicates the broad discretion of the district court and must be decided on its own facts, several RICO conspiracy cases are particularly instructive and persuasively counsel in favor of a severance given the especially severe risk of unfair spillover prejudice here.

In *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), the court severed certain defendants charged in a RICO conspiracy in part because "[t]heir activities often extended to discrete and finite schemes or activities," and while "this relatively minor activity would be sufficient, if proven, to convict them on the RICO charge, they should not be burdened with the stigma of those more actively involved." *Id.* at 750. The court observed that "[t]he problem [wa]s especially acute for those defendants whose alleged activities did not include the sort of violent or heinous offenses with which some of their brethren are charged." *Id.* The court also found that a joint trial would raise serious evidentiary problems, as "[t]here would also be many instances where evidence admitted against one defendant would also be relevant as to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate trial of that defendant alone because its probative value would be outweighed by the danger of unfair prejudice." *Id.* at 752. "Coconspirators' statements regarding violent activities that are part of the RICO conspiracy but not part of the defendant's alleged predicates [we]re but one example of such excluded evidence," and they provided a further basis for severance. *Id.*

Furthermore, the court noted that separate trials were not necessarily less efficient, as "[t]he government would not be able to introduce unlimited 'enterprise' evidence at the

17

individual trial of each defendant," there are fewer "defense counsel cross-examining and raising objections," "[s]idebars are much more infrequent," and "[c]ontinuances and adjournments are less common." *Id.* at 757.

In *United States v. Maisonet*, No. S3 97 CR. 0817 (DC), 1998 WL 355414 (S.D.N.Y. July 1, 1998) (Chin, J.), the court severed one defendant, who was charged in RICO counts with acts of obstruction of justice, from his co-defendants, who were charged in the same RICO counts with crimes involving violence and narcotics. *Id.* at *6. The court based its ruling in part on the defendant's "strong 'spillover prejudice' argument," finding that "[e]ven though [he] [wa]s charged with the RICO counts, the conduct for which he [wa]s charged [wa]s markedly different from that for which his RICO co-defendants [we]re charged." *Id.* The RICO counts included a RICO conspiracy. *See* 1997 WL 34648011 ¶ 23.

In *United States v. Dowtin*, No. 10-CR-657 SJ RML, 2012 WL 7679552 (E.D.N.Y. Nov. 20, 2012), the magistrate recommended, and the district court approved, a severance of two defendants from their co-defendants even though all were charged with RICO conspiracy. *See id.* at *5, *adopted by United States v. Spicer*, No. 10-CR-657 SJ RML, 2013 WL 871952, at *1 (E.D.N.Y. Mar. 7, 2013). The magistrate reasoned that "[e]ven if evidence as to violent acts committed in furtherance of the [charged] Enterprise [wa]s admissible [against the severed defendants] at a separate trial, it would not generate the level of prejudice that would result from a joint trial, which would likely be characterized by extensive testimony as to the numerous and extremely violent acts of co-defendants." *Dowtin*, 2012 WL 7679552, at *5.

The same considerations apply here, and given the even more inflammatory allegations in this case, they make an even greater, and indeed extraordinarily compelling, case for severance. Raniere and the DOS Defendants are accused of participating in a "secretive, cult-like

organization in which 'slaves' [we]re allegedly branded" and forced to provide sex and labor. (Dkt. 46 at 15 (Order denying bail to Raniere)).  The Non-DOS Defendants are not, and they are not even alleged to have known about DOS.  But it is inconceivable that a lay jury sitting through weeks of salacious and disturbing testimony and evidence about "slaves," branding ceremonies, coerced sex, explicit photographs, and, possibly, sex with minors, will be able to compartmentalize that evidence and give the Non-DOS Defendants the individualized consideration they deserve.  *See Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J. concurring) ("It is difficult for [a conspiracy defendant] to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together."); *United States v. Takhalov*, 827 F.3d 1307, 1318 (11th Cir. 2016) ("As it stands, . . . the vast majority of American juries are composed exclusively of humans[,]" not "Vulcans."); *Gallo*, 668 F. Supp. at 750 ("[C]ourts must be scrupulous to avoid the spectre of guilt by association—or, more likely, guilt by confusion.").

It is no secret that "the jury is likely to draw [a] prejudicial inference" from "particularly depraved and offensive acts, such as wanton violence or sexual immorality."  *United States v. Estrada*, 430 F.3d 606, 618 (2d Cir. 2005) (quoting treatise).  Courts recognize this risk and mitigate it by removing inflammatory matters from consideration of the jury.  *See, e.g.*, *United States v. Sherman*, No. 1:10CR00039, 2011 WL 11186, at *2 (W.D. Va. Jan. 4, 2011) (severing property crimes from sex-offender-registration count because of "the likely spillover effect of the sex offender evidence upon the jury"); *Coleman v. Superior Court*, 116 Cal. App. 3d 129, 138 (Cal. Ct. App. 1981) (reversing denial of motion to sever sex crimes from murder count in part because "evidence of sex crimes with young children is especially likely to inflame a jury"); *People v. Robinson*, 340 N.W.2d 631, 633 (Mich. 1983) (evidence of "criminal sexual conduct

19

with minor children" had "a devastating effect on the defendant's right to a fair trial," and it "is simply incredible that anyone would hear all of those prior acts of criminal conduct and then remove them from their mind based upon an instruction by the court").[8]

The government recognizes that the allegations against Raniere and the DOS Defendants are different in kind from those against the Non-DOS Defendants, as demonstrated by its arguments concerning bail for each Defendant.  The government did not hesitate to marshal for the Court the most sordid details of its purported evidence against Raniere, who is currently detained.  It argued that "[t]he charges [Mack] faces are *extremely* serious" because they involve "force, fraud, and coercion."  (Dkt. 17 at 3 (emphasis added)).  It argued that "the serious nature of [Lauren Salzman's] crimes is reflected by her having trafficked victims for labor and services."  (Dkt. 52 at 6).  By contrast, the government grouped "Clare Bronfman, Kathy Russell and Nancy Salzman" together with the tepid suggestion that the charges against them were "properly characterized as serious" because they involved "crimes of deceit."  (*Id.*).  All federal felonies may be serious, but identity theft is not on the same plane as sex trafficking.

In the media, the alleged DOS-related aspects of this case have dominated headlines because sex is far more attention-grabbing than any of the Non-DOS Acts.  *See, e.g.*, *NXIVM: What We Know About Alleged Sex Trafficking, Forced Labor*, Rolling Stone (Mar. 28, 2018), https://www.rollingstone.com/culture/culture-news/nxivm-what-we-know-about-alleged-sex-trafficking-forced-labor-204958/; *The Hollywood Followers of Nxivm, a Women-Branding Sex*

---

[8] The allegations concerning Raniere's relationships with minors are, of course, especially prejudicial.  *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."); *United States v. Spoor*, 904 F.3d 141, 147-48 (2d Cir. 2018) ("The District Court further found that [the defendant's surreptitious recording of children] was 'indicative of a manifestation of continuing sexual exploitation' and that [he] was, in the District Court's judgment, 'really socially depraved and morally bankrupt.'").

*Cult*, The Daily Beast (Mar. 30, 2018), https://www.thedailybeast.com/the-hollywood-followers-of-nxivm-a-women-branding-sex-cult; *Inside Nxivm, the 'Sex Cult' that Preached Empowerment*, N.Y. Times (May 30, 2018), https://www.nytimes.com/2018/05/30/magazine/sex-cult-empowerment-nxivm-keith-raniere.html; *Prosecutors rip Nxivm 'sex cult' leader over bizarre plea for his release*, N.Y. Post (Nov. 21, 2018), https://nypost.com/2018/11/21/prosecutors-rip-nxivm-sex-cult-leader-over-bizarre-plea-for-his-release/; *NXIVM Alleged Sex Cult Leader Denied Release On Bond Ahead Of Trial*, CBS New York (Nov. 15, 2018), https://newyork.cbslocal.com/2018/11/15/nxivm-alleged-sex-cult-leader-keith-raniere-bond/.  Of course, the "sex cult" allegations pertain to DOS, not NXIVM, and the overwhelming majority of NXIVM members, including the Non-DOS Defendants, had no idea that DOS existed at the time of the charged offenses.  But the media has ignored those distinctions, and the jury will likely be tempted to ignore them as well in order to convict the followers of a purported "cult."

A separate trial of the Non-DOS Defendants would feature little or no evidence about the other Defendants' DOS-related conduct.  DOS was a secret organization concealed from everyone who was not part of it, including the Non-DOS Defendants.  The DOS conduct could not in any way show the Non-DOS Defendants' purported entry into or participation in the RICO conspiracy.  Nor would it bear on the existence of the enterprise or the RICO pattern.  The link between the members of the charged enterprise is NXIVM, not DOS, and the DOS conduct does nothing to show that the Non-DOS Defendants functioned as a "continuing unit" with the other Defendants for a "common purpose."  The DOS conduct also does not prove the purported RICO pattern, as it is totally unrelated to the charges against the Non-DOS Defendants, who did not even know DOS existed and certainly did not agree to further its objectives.

Even if the government were permitted to introduce some evidence about DOS (which it should not be), the quantity and detail would necessarily be less extensive than at a joint trial, mitigating the prejudice.  *See Dowtin*, 2012 WL 7679552, at *5; *Maisonet*, 1998 WL 355414, at *6; *Gallo*, 668 F. Supp. at 752.  The government would have much less incentive to present this evidence, and the Court's evidentiary rulings would be much more likely to exclude it if offered.  Moreover, the government would undoubtedly give DOS far less emphasis in its addresses to the jury, and Raniere and the DOS Defendants would not be seated at the defense table, where the jury would otherwise fixate on their presence.  These are no small matters, and they make an immense difference to a criminal defendant fighting for her liberty.

Moreover, the government has produced evidence in discovery that we anticipate it will seek to admit as "other act" or "background" evidence against Keith Raniere, but this evidence is overwhelmingly prejudicial and provides another compelling reason for severance.  We will vigorously oppose its admission at a joint trial,[9] but it is crystal clear that it would be excluded at a separate trial of the Non-DOS Defendants, which would not include Raniere.  ████████

████████████████████

████████████████████

██████████████

overwhelm the jurors with animus against Raniere, and by extension the Non-DOS Defendants who were associated with him through their work with NXIVM, regardless of the fact that the evidence has nothing to do with them and could not be used against them.  *See, e.g.*, *United States v. Cook*, No. 3:17-CR-00065 (SRU), 2018 WL 2303016, at *10-11 (D. Conn. May 21,

---

[9] The Non-DOS Defendants have not yet received any Rule 404(b) notice from the government, and will move to exclude any such prejudicial evidence at the appropriate time.

22

2018) (granting defendant's motion for severance because "there [wa]s a 'serious risk' that the introduction of substantial amounts of Rule 404(b) evidence against the other defendants might 'prevent the jury from making a reliable judgment about [his] guilt or innocence'") (quoting *Zafiro*, 506 U.S. at 539).

While joint trials are generally favored, "there are limits to the risks a co-defendant must endure." *United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980). There is no valid reason to subject the Non-DOS Defendants to the severe prejudice that is inevitable in a joint trial.

### B.    The Joint Trial Date Will Prejudice The Non-DOS Defendants

The Non-DOS Defendants should also be severed from the other Defendants so that they may be tried later than the March 18, 2019 date currently scheduled for trial. Given the massive volume of discovery, including over 3 terabytes of discovery that were produced only yesterday, and the complexity and vagueness of the Indictment, counsel for the Non-DOS Defendants have grave concerns that the March date is not feasible, and that they do not have sufficient time to prepare for trial in a manner consistent with their ethical obligations to their clients. However, as Raniere does not consent to adjourn the trial date any further, we respectfully submit that severing the Defendants into two groups for trial is the appropriate means of accommodating their conflicting interests.

This is a complex case. (Dkt. 138). The government has produced more than 15 terabytes of discovery—the equivalent of 180 floors of a typical academic library. *See United States v. Ganias*, 824 F.3d 199, 217-18 (2d Cir. 2016). The government produced only yesterday more than 3 additional terabytes of data seized pursuant to search warrant from Raniere's and Bronfman's email accounts and a large number of devices seized from Nancy Salzman's residence, such as computers, phones, thumb drives, and external hard drives, as well as a substantial production of videos. Moreover, the government has repeatedly (and as recently as

23

today at the hearing) stated its intent to file yet another superseding indictment, which may well multiply the number of charges and add significant additional discovery to review. Even if the government does not file a superseding indictment, the nature of the government's case could shift dramatically depending on the specific acts the government will use to establish existence of the alleged "enterprise"—notice of which the government will presumably provide in its enterprise motion currently due January 30, 2019. At present, the Defendants are severely limited in their ability to review the discovery in a meaningful fashion to prepare their defenses. As the Non-DOS Defendants have repeatedly explained, the government has not adequately specified which offenses are charged in the Indictment, and it has refused to provide the requested bill of particulars. (Dkt. 194 at 26-31, 36-38; Dkt. 257 at 2-7, 19-20; Dkt. 261 at 2).[10]

Despite these challenges, we have been informed that Raniere will not consent to any request to adjourn the trial date. He is, to be sure, differently situated. Raniere was arrested in March 2018, and he and Mack were indicted in April 2018. They have had more time to prepare their defense than the Non-DOS Defendants, who were indicted three months later, in July 2018. Furthermore, Raniere is the only Defendant detained pending trial. But in respecting Raniere's desire for a speedy trial *and* the government's desire for a joint trial, the Court would deprive the Non-DOS Defendants of a fair trial. We respectfully request that the Court exercise its considerable discretion to sever the Non-DOS Defendants and schedule their trial for a later date.

---

[10] The parties' protracted litigation over assertions of attorney-client privilege creates yet another complication. As the Court is aware, the government disputes Raniere, Bronfman, and Nancy Salzman's contentions that certain documents seized by the government are privileged. The documents that Bronfman and Nancy Salzman assert are privileged are enormously more voluminous than the documents that Raniere asserts are privileged, and it is expected that litigation over these issues will take significantly more time for Bronfman and Nancy Salzman than it will for Raniere. The government represented today to the Court that the protracted privilege litigation is part of the reason for its delay in seeking a superseding indictment.

24

## II.    THE NON-DOS DEFENDANTS MAY BE MISJOINED WITH THE OTHER DEFENDANTS IF THE COURT GRANTS IN PART THEIR MOTION TO DISMISS

The Non-DOS Defendants' motion to dismiss is pending. (Dkts. 194, 257). If the Court dismisses Count One on any ground, or if the Court requires the government to reformulate Count One to cure its duplicity, there will no longer be a single count joining all Defendants or encompassing both the DOS conduct and the non-DOS conduct. Any remaining Non-DOS Defendants will therefore be misjoined with the other Defendants under Federal Rule of Criminal Procedure 8(b), requiring severance as a matter of law. *See* Fed. R. Crim. P. 8(b) ("The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."); *United States v. Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996) (joinder of offenses in multi-defendant indictment is "improper notwithstanding the presence of a common defendant and similar objects, [if] there [i]s no suggestion that the moving defendant knew of or participated in the schemes other than the one with which he was charged"). If these circumstances arise, we respectfully request leave to file a supplemental motion for severance on these grounds.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should sever the Non-DOS Defendants from the other Defendants, and schedule their separate trial for a later date after the completion of the March 18th trial.

Dated:        January 9, 2019
              New York, New York
                                              Respectfully submitted,


/s/ Justine Harris                            /s/ Alexandra A.E. Shapiro
Justine Harris                                Alexandra A.E. Shapiro
Amanda Ravich                                 Fabien M. Thayamballi
Sher Tremonte LLP                             Shapiro Arato LLP
90 Broad Street, 23rd Floor                   500 Fifth Avenue, 40th Floor
New York, New York 10004                      New York, New York 10110
(212) 202-2600                                (212) 257-4880

*Attorneys for Defendant Kathy Russell*       Susan Necheles
                                              Kathleen E. Cassidy
/s/ Robert Soloway                            Hafetz & Necheles LLP
David Stern                                   10 East 40th Street, 48th Floor
Robert Soloway                                New York, New York 10016
Rothman, Schneider, Soloway & Stern, LLP      (212) 997-7400
100 Lafayette Street, Suite 501
New York, New York 10013                      *Attorneys for Defendant Clare Bronfman*
(212) 571-7700


*Attorneys for Defendant Nancy Salzman*

26