**MANDATE**

### UNITED STATES COURT OF APPEALS
### FOR THE
### SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of December, two thousand twenty-two,

Before:      Guido Calabresi,
             José A. Cabranes,
             Richard J. Sullivan,
                   *Circuit Judges*.

_____

United States of America,

                Appellee,

         v.                                              **JUDGMENT**

Keith Raniere, also known as Vanguard, and           Docket Nos. 20-3520(L), 20-3789(CON)
Clare Bronfman,

                Defendants - Appellants,

Allison Mack, Kathy Russell, Lauren Salzman,
and Nancy Salzman, also known as Prefect,

                Defendants.

_____

The appeals in the above captioned case from judgments of the United States District Court for the Eastern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that, for the reasons explained in this Court's opinion and accompanying summary order, the district court's judgments are AFFIRMED.

                              For the Court:
                              Catherine O'Hagan Wolfe,
                              Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 01/03/2023**

20-3520-cr (L)
*United States v. Raniere*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2021

No. 20-3520-cr (L); 20-3789-cr (Con)

UNITED STATES OF AMERICA,
*Appellee,*

v.

KEITH RANIERE, also known as Vanguard, and CLARE BRONFMAN,
*Defendants-Appellants,*

ALLISON MACK, KATHY RUSSELL, LAUREN SALZMAN, and NANCY
SALZMAN, also known as Prefect,
*Defendants.*[1]

---

On Appeal from the United States District Court
for the Eastern District of New York

---

ARGUED: MAY 3, 2022
DECIDED: DECEMBER 9, 2022

---

[1] The Clerk of Court is directed to amend the caption as set forth above.

───────────

Before: CALABRESI, CABRANES, and SULLIVAN, *Circuit Judges*.

───────────

Following a jury trial before the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*), Defendant Keith Raniere was convicted of numerous crimes related to his leadership of two organizations, a self-styled executive coaching and self-help organization called NXIVM and a secret society called DOS.  On appeal, Raniere challenges his convictions for sex trafficking crimes, in violation of 18 U.S.C. § 1591.  At the center of his appeal is the meaning of "commercial sex act," which Section 1591 defines as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).  Raniere principally argues that to qualify as a "commercial sex act," there must be a monetary or financial component to the "[]thing of value" that is given or received and the relevant sexual exploitation must be for profit.  He contends that evidence the Government submitted at trial showing that individuals received benefits, such as privileged positions within an organization, are insufficient to sustain his sex trafficking convictions.  We conclude that Section 1591 requires neither that a "[]thing of value" have a monetary or financial component nor that the sexual exploitation be conducted for profit.  Accordingly, we AFFIRM the October 30, 2020 judgment as it concerns Raniere's sex trafficking offenses: the sex trafficking conspiracy (Count 5), the sex trafficking of

Nicole (Count 6), the attempted sex trafficking of Jay (Count 7), and the racketeering act of sex trafficking of Nicole (Act 10A).

—————

> TANYA HAJJAR, Assistant United States Attorney (Kevin Trowel, Assistant United States Attorney, *on the brief*), for Breon Peace, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Appellee United States of America.*
>
> JOSEPH M. TULLY, Tully & Weiss Attorneys at Law, Martinez, CA (Jennifer Bonjean, Bonjean Law Group, PLLC, New York, NY, *on the brief*), for Defendant-Appellant Keith Raniere.

—————

JOSÉ A. CABRANES, *Circuit Judge*:

After a six-week jury trial, Keith Raniere was convicted in the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*) of numerous counts related to his leadership of two organizations: a self-styled executive coaching and self-help organization called NXIVM and a secret society called "DOS," an acronym for "Dominus Obsequious Sororium," a phrase that roughly translates to "Lord/Master of the Obedient Female Companions." At trial, the Government presented evidence that

Raniere led both entities as pyramid organizations, and that he—alongside his "inner circle"—committed, attempted, or conspired to commit various crimes, including sex trafficking, forced labor, identity theft, wire fraud, racketeering, sexual exploitation of a minor, possession of child pornography, and obstruction of justice.  During the lengthy trial, the Government also presented evidence that members of the organizations recruited and groomed sexual partners for Raniere, and that numerous women were coerced to engage in nonconsensual sexual acts with Raniere.

On appeal, Raniere raises numerous challenges to his various convictions.  By summary order issued on the same day as this opinion, we dispose of most of Raniere's arguments (along with the appeal of Raniere's co-defendant, Clare Bronfman).  We write separately here to address Raniere's arguments concerning his sex trafficking convictions under 18 U.S.C. § 1591.

Raniere's arguments turn on the meaning of "commercial sex act," which the statute defines as "any sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  He principally argues that to qualify as a "commercial sex act," there must be a monetary or financial component to the "[]thing of value" that is given or received, and the sexual exploitation must be for profit.  We conclude that the statute has no such

requirement.  Accordingly, we AFFIRM the District Court's judgment concerning his sex trafficking convictions.[2]

## I. BACKGROUND[3]

In or around 2003, Raniere founded an organization called NXIVM, a self-styled executive coaching and self-help organization. New members paid thousands of dollars to attend self-help workshops.  NXIVM members referred to Raniere as "Vanguard."

In 2015, Raniere created the secret society "DOS," which was structured as a pyramid, with Raniere at the head, followed by first-line "masters" and their subordinate "slaves."  "Slaves" were expected to be obedient to their "masters."

---

[2] In particular, through this opinion, we AFFIRM his convictions for the sex trafficking conspiracy (Count 5), the sex trafficking of Nicole (Count 6), the attempted sex trafficking of Jay (Count 7), and the racketeering act of sex trafficking of Nicole (Act 10A).

[3] Because Raniere appeals his convictions following a jury trial, we recite the facts from the trial evidence "in the light most favorable to the prosecution." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) ("The reviewing court considers only the 'legal' question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'") (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also, e.g.*, *United States v. Napout*, 963 F.3d 163, 168 (2d Cir. 2020) (noting that "[b]ecause appellants . . . appeal their convictions following a jury trial, we recount the facts viewing the evidence adduced in the district court in 'the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor'" (quoting *United States v. Rosemond*, 841 F.3d 95, 99–100 (2d Cir. 2016))).

Apart from Raniere, all DOS members were women.   And Raniere's identity as the head of DOS was initially concealed from newly recruited "slaves," who were told that the organization was a "women's-only secret society."

DOS "masters" recruited slaves mostly from NXIVM and targeted women who were experiencing difficulties in their lives.   To join, DOS recruits were required to provide "collateral" to prove their commitment to the organization.   "Collateral" took many forms, including sexually explicit photographs and videos of themselves, rights to financial assets, and letters containing damaging accusations—whether true or untrue—about family members and friends.

DOS "slaves" were expected to provide their "masters" with services called "acts of care," which included buying them groceries, editing videos, cleaning, and organizing.   Each "slave" was expected to provide about an hour of work per week for her "master" as her "normal contribution."   In some cases, "masters" assigned their "slaves" to engage in sexual conduct with Raniere and implied that collateral might be released if the salves refused.   DOS "slaves" were also required to be branded with a symbol that, unbeknownst to them, consisted of Raniere's initials.   During the branding ceremony, participants were normally required to be nude and to say, "Master[,] please brand me.  It would be an honor, an honor that I want to wear for the [re]st of my life."

Allison Mack—a DOS "master" and one of Raniere's co-defendants who pleaded guilty to racketeering and racketeering conspiracy—recruited Nicole[4] to join DOS as a "slave" in February 2016. As part of that process, Mack asked that Nicole provide "collateral." Nicole provided a series of letters she wrote falsely alleging sexual abuse by her father and other damaging accusations, as well as a sexually explicit video of herself. She was later required to provide additional "collateral," including credit card authorizations and the right to her grandmother's wedding ring.

Mack subsequently "assigned" Nicole to contact Raniere and tell him that she would do "anything that he asked." On May 31, 2016—while Nicole and Mack were together in Mack's house—Raniere called Mack, and Mack instructed Nicole to go outside so that Nicole would meet Raniere "across the grass" from the house's backdoor. Raniere subsequently blindfolded Nicole, led her into a car, and drove her to a house. He then led Nicole—still blindfolded—through some trees and inside a building. There, he instructed her to undress and tied her to a table. Another person in the room, whose identity was unknown to Nicole, performed oral sex on Nicole. Nicole subsequently told Mack about the incident, and Mack called Nicole "really brave."

Nicole had additional sexual encounters with Raniere during her time as a DOS "slave." Mack regularly required Nicole and other

---

[4] The District Court ordered that during trial, certain witnesses were only to be referred to by first name or pseudonym.

7

"slaves" to pose for nude photographs, including close-up photographs of their genitalia.  Nicole also performed uncompensated work for Mack, including transcribing tapes and reviewing articles.

Mack also recruited another "slave," India, who in turn recruited a second-order "slave" named Jay.  Jay provided "collateral" to India, including a sex tape and a video describing abuse to which she was subjected as a child.  She provided further "collateral" on a monthly basis.

Jay was required to perform uncompensated services for Mack, including cleaning her house, doing her laundry, and picking up her groceries.  She was also required to transcribe certain videos without compensation.  In addition, Mack gave Jay a "special assignment" to "seduce" Raniere and "have him take a naked picture" of Jay; Jay understood this assignment to include having sex with Raniere.  Jay refused to carry out the assignment and decided to leave DOS.

After Raniere and several members of his "inner circle" were indicted, each of Raniere's co-defendants pleaded guilty to various crimes.  Following a six-week jury trial before Judge Garaufis, Raniere was convicted of: racketeering conspiracy (Count 1); racketeering (Count 2); forced labor conspiracy (Count 3); wire fraud conspiracy (Count 4); sex trafficking conspiracy (Count 5); sex trafficking of Nicole (Count 6); and attempted sex trafficking of Jay (Count 7).[5]  In support of their guilty finding for Count 2, the jury found that the

---

[5] We refer to the counts as they appear on the verdict sheet.

8

Government had proved that Raniere had engaged in all of the alleged racketeering acts: four acts of conspiracy to commit identity theft, two acts of identity theft, conspiracy to unlawfully possess an identification document, two acts of sexual exploitation of a child, possession of child pornography, conspiracy to alter records for use in an official proceeding, trafficking for labor and services, document servitude,[6] extortion, sex trafficking of Nicole, and forced labor.[7]  The District Court sentenced Raniere principally to 120 years' imprisonment and a $250,000 fine.

## II.  DISCUSSION

We dispose of most of Raniere's arguments on appeal in a summary order filed simultaneously herewith.  We write separately in this opinion to address Raniere's argument that a "commercial sex act"—statutorily defined as "any sex act, on account of which anything

---

[6] Document servitude occurs when one:

> knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons.

18 U.S.C. § 1592(a).

[7] The racketeering act of sex trafficking of Nicole was referred to on the verdict sheet as Act 10A.

of value is given to or received by any person," 18 U.S.C. § 1591(e)(3)—must involve the exchange of monetary or financial benefits.  We first address the statutory text before turning to Raniere's specific challenges.

## A. "Commercial Sex Act"

Congress enacted the statute at the center of this appeal, 18 U.S.C. § 1591, as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464 (2000).  In passing the TVPA, Congress's purpose was "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  22 U.S.C. § 7101(a).

In relevant part, Section 1591 provides for punishment of any individual:

(a) Who[] knowingly—

(1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; *or*

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

> [while also] knowing[] . . . that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . .

18 U.S.C. § 1591(a) (emphasis added).

Section 1591 goes on to define a "commercial sex act" as "any sex act, on account of which *anything of value* is given to or received by any person." *Id.* § 1591(e)(3) (emphasis added). The statute does not explicitly define the phrase "anything of value," and the scope of that phrase is the subject of the present appeal.

Raniere argues that Section 1591 "was designed to punish sexual exploitation for economic profit." Raniere's Br. 23–24; *see also* Raniere's Supp. Br. 9. He therefore concludes that the phrase "anything of value," as it is used in the statute, must mean "economic benefit[]." Raniere's Br. at 24. We do not agree.

We begin our analysis "with the statutory text, exhausting 'all the textual and structural clues' bearing on its meaning and construing each word 'in its context and in light of the terms surrounding it.'" *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (footnote omitted) (first quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); then quoting *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)). Where, as here, a phrase is "not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). If we find that a phrase is unambiguous and is "coherent and consistent" with the statutory scheme, then "the inquiry ceases." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,

11

841 F.3d 133, 148 (2d Cir. 2016) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)); *see also Matal v. Tam*, 137 S. Ct. 1744, 1756 (2017) (rejecting a proposed "resort to legislative history" as unpersuasive because a court's "inquiry into the meaning of the statute's text ceases when 'the statutory language is unambiguous and the statutory scheme is coherent and consistent'") (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 456 (2002)).

We start with the prefix "any" in the phrase "anything of value." "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (cleaned up).[8] Our understanding of "anything of value" is thus guided by the expansive meaning of "any." *See United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015) ("The phrase 'anything of value' [in Section 1591(e)(3)] is extremely broad."). In addition, we observe that Congress's definition of "commercial sex act"—"*any* sex act, on account of which *any*thing of value is given to or received by *any* person," 18 U.S.C. § 1591(e)(3) (emphases added)— uses the word or prefix "any" three times. Congress's repeated use of the word "any" in its definition "commercial sex act" further supports

---

[8] In *United States v. Gonzales*, 520 U.S. 1 (1997), the Supreme Court "considered a provision [18 U.S.C. § 924(c)(1)] that imposed an additional sentence for firearms used in federal drug trafficking crimes and provided that such additional sentence shall not be concurrent with 'any other term of imprisonment.'" *Ali*, 552 U.S. at 219 (quoting *Gonzales*, 520 U.S. at 4). "Notwithstanding the subsection's initial reference to federal drug trafficking crimes, [the Court] held that the expansive word 'any' and the absence of restrictive language left 'no basis in the text for limiting' the phrase 'any other term of imprisonment' to federal sentences." *Id*. (quoting *Gonzales*, 520 U.S. at 5).

an expansive understanding of the specific phrase at issue here, "anything of value."

We have previously had occasion, albeit in other contexts, to consider the remainder of the phrase. We have clarified in those other contexts that the phrase "thing of value" "is generally construed to cover intangibles as well as tangibles." *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979). In *Girard*, we observed that all of the following are "things of value": "amusement," "[s]exual intercourse, or the promise of sexual intercourse," "a promise to reinstate an employee," "an agreement not to run in a primary election," and "[t]he testimony of a witness." *Id*. (citations omitted). And in *United States v. Maneri*, we held that the phrase "thing of value" includes intangibles, specifically "the opportunity for a sexual encounter, in return for distributing child pornography" in the context of the advisory Sentencing Guidelines for 18 U.S.C. § 2252. 353 F.3d 165, 168 (2d Cir. 2003). Although the statutory phrase at issue here is "anything of value" and not a misspelled version, "any thing of value," our earlier holdings on "thing of value" remain instructive. Indeed, adding the expansive prefix "any" onto "thing" only underscores our understanding that "anything of value" should be broadly understood to include intangibles. A "thing of value" as it appears in Section 1591 may be intangible.

Finally, and consistent with our expansive understanding of the phrase thus far, we interpret the word "value" to refer to "a subjective, rather than objective, concept." *Cook*, 782 F.3d at 988 (quoting *United States v. Petrovic*, 701 F.3d 849, 858 (8th Cir. 2012)). Stated differently,

in the ordinary sense, we construe the word "value" to "focus . . . on the value which the [recipient] subjectively attaches to what is sought to be received." *Id.* at 988–89 (quoting *Petrovic*, 701 F.3d at 858); *see also United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983) (concluding that the phrase "anything of value," as it is used in the bribery statute, 18 U.S.C. § 201, "has consistently been given a broad meaning" and that the district court correctly construed the phrase "to focus on the value that the defendants subjectively attached to the items received"). This conforms with the dictionary definition of "value," which includes "relative worth, utility, or importance."  3 Webster's Third New International Dictionary 2530 (1976).

Bearing in mind these textual clues, we conclude that, as it is used in Section 1591, the phrase "anything of value" need not have a monetary or financial component.  Nothing in the statutory text indicates such a requirement, and in fact, a natural reading of the broad language used in Section 1591(e)(3) forecloses such a reading. Put another way, for purposes of the statute, monetary worth is not the sole measure of "value."  *See United States v. Nilsen*, 967 F.2d 539, 543 (11th Cir. 1992) (discussing the phrase "thing of value" as it is used in 18 U.S.C. § 876).  Accordingly, we hold that for sexual exploitation to be actionable under Section 1591, it need not have been conducted—as Raniere argues it must—for profit.[9]

---

[9] A number of district courts within our Circuit have reached similar conclusions concerning Section 1591's definition of "commercial sex act" in civil cases brought pursuant to 18 U.S.C. § 1595, which provides for a civil cause of action for violations of the TVPA.  In these cases, courts have concluded that the statutory

## B. Raniere's Arguments

Turning to Raniere's specific arguments on appeal as they concern his sex trafficking convictions, we find none of them persuasive.

### a. Challenges to the Jury Instruction

Raniere first argues that the District Court erred in its instructions to the jury on the sex trafficking counts.

"We review de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (quoting *United States v. Binday*, 804 F.3d 558, 581–82 (2d Cir. 2015)).[10]  "In reviewing a jury instruction, we 'examine not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law.'" *United States v. Al Kassar*, 660 F.3d 108, 127

---

phrase "anything of value" encompasses promises to help a person with career advancement.  *See, e.g.*, *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 WL 4124616, at *9 (S.D.N.Y. Sept. 9, 2021); *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019); *Canosa v. Ziff*, No. 18-CV-4115 (PAE), 2019 WL 498865, at *22 n.26 (S.D.N.Y. Jan. 28, 2019); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 521 (S.D.N.Y. 2018).

[10] We assume without deciding that Raniere preserved the relevant challenges to the jury instructions below.

(2d Cir. 2011) (quoting *United States v. Bala*, 236 F.3d 87, 94–95 (2d Cir. 2000)).

The District Court instructed the jury on the "element" of sex trafficking as follows:

> The third element that the Government must prove is that the Defendant knew that Nicole would be engaged in a commercial sexual act. *A commercial sexual act is any sex act of which anything of value is given to or received by any person because of such sex act*. It is not required that the victim actually performed a commercial sex act as long as the Government has proved that the Defendant recruited, enticed, harbored, transported, provided, obtained, maintained, patronized or solicited the victim for purposes of engaging in commercial sex acts. *A thing "of value" need not involve a monetary exchange and need not have any financial component*. The phrase "any sex act" should be given its plain meaning and may include any act performed with another for sexual gratification.

Jury Charge at 99–100, *United States v. Mack*, No. 18-CR-204 (NGG) (E.D.N.Y. June 18, 2019), ECF No. 728 (emphases added).

Raniere's initial objection is to the first italicized sentence above. In particular, he disputes the propriety of the District Court's usage of the phrase "because of" and argues that the sentence should have read: "A 'commercial sex act' is any sex act *on account of* which anything of value is given to or received by any person." Defendant Keith Raniere's Requests to Charge at 64, 86, *Mack*, No. 18-CR-204 (June 7,

2019), ECF No. 692-1 (emphasis added).  He argues that the phrase "because of" "means only a 'connection to' or a proximate causational relationship to," whereas "on account of" "underscores a *quid pro quo*." Raniere's Supp. Br. 18.

We find no error in the District Court's use of the term "because of."  Although the statute, 18 U.S.C. § 1591(e)(3), uses the phrase "on account of," we find no meaningful difference between that phrase and "because of."  Raniere does not point to any authority supporting his view of the difference in meaning between "because of" and "on account of," which we understand to be virtually indistinguishable. Indeed, in a different context, the Supreme Court has noted that "[t]he words 'because of' mean 'by reason of: on account of.'"  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quoting 1 Webster's Third New International Dictionary 194 (1966)).  As a result, the District Court's use of "because of" neither failed to inform the jury adequately of the law nor misled the jury about the correct legal rule.

Raniere next challenges the second italicized sentence in the above jury instructions: "A thing 'of value' need not involve a monetary exchange and need not have any financial component."  He argues that a "commercial sex act" must involve the exchange of monetary of financial benefits.  For the reasons stated in Section II.A of this opinion, *ante*, we reject his argument.  As we have concluded, the phrase "anything of value" need not have a monetary or financial component, and the actionable sexual exploitation need not have been conducted for profit.  The jury was neither misinformed nor misled

17

about the law. [11]  Accordingly, we find no error in the District Court's instruction.

### b. Sufficiency-of-the-Evidence Challenge to the Sex Trafficking Counts

Next, Raniere challenges the sufficiency of the evidence presented against him at trial concerning his Section 1591 counts: sex trafficking conspiracy, sex trafficking of Nicole, and attempted sex trafficking of Jay.

When preserved, we review claims of insufficient evidence *de novo*. *Capers*, 20 F.4th at 113.  When hearing a sufficiency challenge on appeal, we make a "limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against him and a jury finding of guilt 'beyond a reasonable doubt.'"  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 314–15 (1979)).  "All that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all."  *Id*. at 244 (quoting *Jackson*, 443 U.S. at 319).

---

[11] To the extent Raniere also contends that the second italicized sentence in the above jury instructions is duplicative because the first italicized sentence's reference to "anything of value" already implied that the thing of value need not involve a monetary exchange or have any financial component, we fail to see how any potential redundancy misled the jury about the correct legal rule.

It is no surprise then that a defendant raising a sufficiency challenge "face[s] a heavy burden." *Capers*, 20 F.4th at 113 (quoting *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020)). Indeed, "we must sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). We "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020)).

In conducting our review, "[w]e must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *Atilla*, 966 F.3d at 128 (cleaned up). And "[w]e must credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *Id.* (cleaned up).

### i.  "Anything of Value"

Raniere first argues that the Government failed to provide evidence that "anything of value" was received or given in connection with a sex act. We disagree.

The Government did in fact present evidence at trial that DOS "masters," including Mack, obtained "things of value" in connection with assigning their DOS "slaves" to engage in sexual acts with Raniere.  For example, the Government presented evidence that Mack was able to maintain and strengthen her privileged position in the DOS hierarchy because of the relationship between Raniere and one of Mack's "slaves," Nicole.  The Government also presented evidence that Raniere set an expectation that DOS "masters" would receive approximately 40 hours of "work" per week from their various "slaves."  Gov. App'x 235 (testimony of Lauren Salzman, one of Raniere's co-conspirators who pleaded guilty to racketeering and racketeering conspiracy).  Moreover, those "masters" who were able to recruit a sufficient number of "slaves" (and "slaves" of "slaves") would qualify for a "special position" and receive "special privileges" from Raniere.  *Id.*  Furthermore, the Government presented evidence that Raniere authorized certain payments to Mack for her work as "head trainer" at the same time that Mack encouraged a "slave," India, to "complete [an] assignment" involving "tak[ing] all her clothes off, while [Raniere was] clothed, pos[ing] in the most revealing way, and hav[ing Raniere] take a picture of her."  *Id.* at 1269, 1271 (emails between Raniere and Mack).

Raniere argues that "[m]aintaining a spot in the first line" of DOS cannot constitute "anything of value" for purposes of Section 1591.  *Id.* at 1047 (Government counsel's trial summation).  But as discussed above, we reject the argument that only the exchange of things with monetary value can suffice for purposes of the statutory

definition of "commercial sex act."   A privileged position in an organization may constitute intangible "value."   And indeed, here, evidence presented at trial demonstrated that the privileged position came with direct benefits, including free labor from the "slaves" who were expected to perform "acts of care" for their "masters."

The evidence regarding the giving or receiving of "anything of value" submitted at trial was neither nonexistent nor meager.   We conclude that the evidence was strong enough to reach a jury and that Raniere was afforded at least "the minimum that due process requires." *Musacchio*, 577 U.S. at 243.   We therefore decline to disturb Raniere's convictions on these counts.   The Government did not fail to provide sufficient evidence that "anything of value" was received or given in connection with a sex act.

### ii.   "On Account of"

Next, Raniere argues that even if things of value were given or received, they were not given or received "on account of" a sexual act. The Government presented evidence that on May 31, 2016, Raniere blindfolded Nicole, ordered her to undress, and tied her to a table, after which a third person performed oral sex on Nicole in Raniere's presence.   Raniere argues that the Government failed to present evidence that Mack—Nicole's "master"—received anything of value "on account of" the May 31, 2016 sexual act.

In another context, the Supreme Court has interpreted the phrase "'on account of' to "require[e] a causal connection between the term that the phrase 'on account of' modifies and the factor specified

21

in the statute . . . ."  *Rousey v. Jacoway*, 544 U.S. 320, 326 (2005) (interpreting 11 U.S.C. § 522(d)(10)(E)).  Similarly, we interpret the statutory language in Section 1591(e)(3) to require a causal connection between the sexual act and the giving or receiving of anything of value.

With that in mind, we conclude that Raniere's sufficiency challenge lacks merit.  At trial, the Government offered evidence from which a reasonable jury could have concluded that Mack's receipt of various things of value were causally connected to her assigning her "slaves" to engage in sexual acts with Raniere, including the May 31, 2016 incident.  This included testimony that Mack directed Nicole "[t]o reach out to . . . Raniere," which Nicole first did in April 2016 by email. Gov. App'x 747–48 (testimony of Nicole).   The Government also offered testimony that Nicole understood Mack's relationship with Raniere to be the "most important relationship" to Mack, and that, accordingly, Nicole understood that it was "important to [Nicole's] relationship with [Mack] to make [Raniere] happy" and that how Nicole "related to [Raniere] . . . reflected on [Mack]."  *Id.* at 764–65 (testimony of Nicole).  Nicole understood that she needed to be "well behaved" in front of Raniere.  *Id.* at 765.  And Nicole kept Mack apprised of her relationship with Raniere, including by informing her of the May 31, 2016 incident.  *Id.* at 760.  She further received encouragement from Mack to "make [Raniere's] life easier."  *Id.* at 764.

The Government's evidence purporting to establish that Mack received things of value "on account of" her assigning "slaves" to engage in sexual acts with Raniere was neither nonexistent nor

meager.  Based on this evidence, a reasonable jury could conclude that Mack's privileged position in DOS was causally connected with her "assignment" of Nicole to Raniere for sexual purposes.  As with the evidence that "anything of value" was received or given in connection with a sex act, the evidence relevant to whether Mack received things of value "on account of" her assigning "slaves" to engage in sexual acts with Raniere was strong enough to reach a jury.  Thus, we conclude that Raniere had a meaningful opportunity to defend himself.

### iii.  "Coercion"

Finally, Raniere argues that there was no evidence that the sexual acts were "coerced" as required by 18 U.S.C. § 1591.  The statute defines "coercion" to include "threats of serious harm," 18 U.S.C. § 1591(e)(2)(A), and the statute in turn defines "serious harm" to mean:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

*Id.* § 1591(e)(5).

Nicole testified that she felt that she had "[n]o choice" in complying with Mack's instruction to "tell [Raniere] that [she] would

23

do anything that he asked [her] to do."  Gov. App'x 756 (testimony of Nicole).  She further testified that she had submitted "collateral" to Mack in the form of, *inter alia*, letters implicating her family members in criminal activity, a sexually explicit video, and a letter about a prominent former romantic partner that could "ruin [Nicole's] career." *Id.* at 740.  Nicole testified that she understood that breaking her "commitment" to DOS and her "master" would mean that her "collateral" would be released.  *Id.* at 746.

Once again, Raniere has failed to persuade us that there is insufficient evidence to sustain his convictions.  Any rational trier of fact could have found coercion beyond a reasonable doubt.

## III.  CONCLUSION

To summarize: We hold that to qualify as a "commercial sex act" for purposes of 18 U.S.C. § 1591, the "[]thing of value" given or received need not have a monetary or financial component.  Thus, for sexual exploitation to be actionable under Section 1591, it need not have been conducted for profit.

For the foregoing reasons, and for the reasons explained in our summary order also entered today, we **AFFIRM** the District Court's judgment of conviction entered on October 30, 2020, as it concerns the sex trafficking conspiracy (Count 5), the sex trafficking of Nicole (Count 6), the attempted sex trafficking of Jay (Count 7), and the racketeering act of sex trafficking of Nicole (Act 10A).

20-3520-cr (L)
*United States v. Raniere*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of December, two thousand twenty-two.

PRESENT:    GUIDO CALABRESI,
            JOSÉ A. CABRANES,
            RICHARD J. SULLIVAN,
                        *Circuit Judges.*

————————————————————————

UNITED STATES OF AMERICA,

                        *Appellee,*

            v.                                          20-3520-cr (L);
                                                        20-3789-cr (Con)

KEITH RANIERE, also known as Vanguard, and
CLARE BRONFMAN,

                        *Defendants-Appellants,*

ALLISON MACK, KATHY RUSSELL, LAUREN
SALZMAN, and NANCY SALZMAN, also known
as Prefect,

                        *Defendants.*[*]

————————————————————

[*] The Clerk of Court is directed to amend the caption as set forth above.

1

_____

| | |
|---|---|
| **FOR APPELLEE:** | TANYA HAJJAR, Assistant United States Attorney (Kevin Trowel, Assistant United States Attorney, *on the brief*), *for* Breon Peace, United States Attorney, Eastern District of New York, Brooklyn, NY. |
| **FOR DEFENDANT-APPELLANT RANIERE:** | JOSEPH M. TULLY, Tully & Weiss Attorneys at Law, Martinez, CA (Jennifer Bonjean, Bonjean Law Group, PLLC, New York, NY, *on the brief*). |
| **FOR DEFENDANT-APPELLANT BRONFMAN:** | RONALD S. SULLIVAN, JR., Ronald Sullivan Law PLLC, Washington, DC (Daniel R. Koffmann, Quinn Emanuel Urquhart, & Sullivan, LLP, New York, NY, *on the brief*). |

Appeal from judgments, entered October 7, 2020, and October 30, 2020, by the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the October 7, 2020 and October 30, 2020 judgments of the District Court be and hereby are **AFFIRMED**.

On March 13, 2019, a federal grand jury returned a Second Superseding Indictment ("Indictment") charging Defendant Keith Raniere with, inter alia, racketeering, sex trafficking, and a forced-labor conspiracy involving multiple victims. The Indictment also charged Defendant Clare Bronfman and others with a number of related crimes.

The Government alleged that Raniere was the founder of a self-styled executive coaching and self-help organization called NXIVM, and that Bronfman served on NXIVM's executive board. It further alleged that Raniere maintained a rotating group of female NXIVM members with whom he had sexual relationships. These women were barred from both having sexual relationships with anyone but Raniere and disclosing their relationship with Raniere to others.

As alleged, members of Raniere's "inner circle" would recruit vulnerable members of NXIVM to a secret society called "DOS," an acronym for "Dominus Obsequious Sororium," a phrase that roughly translates to "Lord/Master of the Obedient Female Companions." DOS was run as a pyramid organization, with Raniere on the top, followed by first-line "masters," and then "slaves." Apart from Raniere, all other DOS members were women. DOS "masters" would recruit "slaves" to the organization, who were required to deposit "collateral" to show their commitment to the organization in the form of, inter alia, sexually explicit photographs and videos depicting the

slaves in compromising positions, letters accusing loved ones of wrongdoing, and credit card authorizations. DOS "masters" would give their "slaves" assignments, which included uncompensated labor like buying groceries, cleaning, and organizing. DOS "masters" would also give their "slaves" assignments to engage in sexual acts with Raniere. DOS "slaves" who failed to comply with their "masters'" assignments risked the release of their "collateral."

Following a six-week jury trial, Raniere was convicted on all counts submitted to the jury.[1] He now raises various challenges to his convictions. Separately, Bronfman—who pleaded guilty to two counts prior to the commencement of Raniere's trial—brings a challenge to the procedural reasonableness of the District Court's imposition of an 81-month sentence for her crimes.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal. Raniere's appeal as it concerns his convictions for sex trafficking, attempted sex trafficking, and sex trafficking conspiracy, in violation of 18 U.S.C. § 1591—including both his challenges to the relevant jury instructions and his sufficiency-of-the-evidence arguments— is addressed in an opinion entered this same day. We write separately here to address Raniere's remaining claims as well as Bronfman's appeal, and address each in turn.

## I. RANIERE'S APPEAL

### A. Sufficiency-of-the-Evidence Challenges

Raniere first argues that insufficient evidence was presented to the jury to sustain his convictions for various counts. Where, as here, claims of insufficiency are preserved below, we review those claims *de novo. United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021). A defendant challenging the sufficiency of the evidence at trial "face[s] a heavy burden because we must sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor

---

[1] We refer to the counts as they appear on the verdict sheet: racketeering conspiracy (Count 1); racketeering (Count 2); forced labor conspiracy (Count 3); wire fraud conspiracy (Count 4); sex trafficking conspiracy (Count 5); sex trafficking of Nicole (Count 6); and attempted sex trafficking of Jay (Count 7). The jury found that the Government had proved all of the racketeering acts alleged on the verdict sheet: conspiracy to commit identity theft – Ashana Chenoa (Act 1A); conspiracy to unlawfully possess identification document (Act 1B); sexual exploitation of a child on November 2, 2005 – Camila (Act 2); sexual exploitation of a child on November 24, 2005 – Camila (Act 3); possession of child pornography (Act 4); conspiracy to commit identity theft (Act 5A); identity theft – James Loperfido (Act 5B); identity theft – Edgar Bronfman (Act 5C); conspiracy to alter records for use in an official proceeding (Act 6); conspiracy to commit identity theft – Marianna (Act 7); trafficking for labor and services – Daniela (Act 8A); document servitude – Daniela (Act 8B); extortion (Act 9); sex trafficking – Nicole (Act 10A); forced labor – Nicole (Act 10B); and conspiracy to commit identity theft - Pamela Cafritz (Act 11).

3

and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up).
"A court may enter a judgment of acquittal only if the evidence that the defendant committed the
crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a
reasonable doubt." *Id.* (quoting *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020)).

We address Raniere's numerous sufficiency claims below.

a. **Forced Labor and Forced Labor Conspiracy, in Violation of 18 U.S.C. § 1589
(Count 3 and Racketeering Act 10B)**

In challenging the sufficiency of the evidence on the forced labor conspiracy charge (Count
3) and the racketeering act of forced labor of Nicole (Act 10B),[2] Raniere argues (1) that the "acts of
service" that Nicole conducted for Allison Mack were "isolated personal favors and kind gestures"
that do not rise to the definition of "labor or services" used in the statute, 18 U.S.C. § 1589; and (2)
that Nicole had "knowingly consented to these types of activities as part of her membership in
DOS." Raniere's Br. 33. We find neither argument convincing.

As to the first argument—that Nicole's "acts of service" do not rise to the level of "labor or
services" as that term is used in Section 1589—we begin by looking to the "ordinary meaning" of
the statutory phrase "labor or services." *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010).
Labor includes the "expenditure of physical or mental effort especially when fatiguing, difficult, or
compulsory." *Id.* at 44 n.10 (quoting Merriam-Webster's Third New International Dictionary
Unabridged (2002)). Here, evidence presented to the jury showed that DOS "slaves" were coerced
into providing uncompensated work by the threat of the release of their "collateral." In particular,
the Government offered evidence at trial that Nicole provided uncompensated work for Mack,
including transcribing tapes and reviewing articles. **[Gov. App'x 786.]** Thus, we conclude that "the
plain meaning of the forced labor statute unambiguously applies to [Raniere's] conduct." *Id.* at 45.

The second argument—that Nicole had consented to the labor—is also unconvincing. "The
fact that [Nicole's] enslavement arose from her initial participation in consensual [DOS] activities
does not require" us to infer, much less conclude, that Nicole consented to all of the labor she
subsequently undertook. *See id.* At trial, the Government presented evidence that Nicole was
required to produce "collateral," including in the form of sexually explicit videos of herself, letters in
which she falsely accused her father of sexual abuse, and credit card authorization forms, which she
feared would be released if she failed to comply with Mack's directives. **[Gov. App'x 738–40.]**
Upon review of the record, we conclude that the jury was presented with ample evidence showing

---

[2] The District Court ordered that during trial, certain witnesses only be referred to by first name
or pseudonym. We address the propriety of the District Court's order *post.*

that Nicole's labor was nonconsensual.  There is therefore no basis for overturning the forced labor or forced labor conspiracy convictions.

### b. Sexual Exploitation of a Child, in Violation of 18 U.S.C. § 2251 (Racketeering Acts 2 and 3)

Raniere argues that the Government failed to prove the racketeering acts of child exploitation of Camila (Racketeering Acts 2 and 3), principally pointing to the fact that Camila did not testify at trial.  Raniere argues that, at most, his possession of explicit photographs dated November 2, 2005 and November 24, 2005 shows that he was guilty of mere *possession* of child pornography.  He argues that no evidence was presented specifically showing that he "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d]" Camila to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2251.  *See* Raniere's Br. 36–37.

We do not agree.  Even without Camila's testimony, the jury was presented with ample evidence showing that Raniere began sexually abusing Camila in September 2005.  *See, e.g.*, Gov. App'x 710-1–10-4, 1171, 1268 (emails and text messages between Camila and Raniere referring to the beginning of their sexual relationship as around September 2005); Gov. App'x 416–17 (testimony from Daniela that she had spoken to Raniere about his sexual relationship with Camila at some point before the fall of 2006).  Moreover, the jury was shown messages between Camila and Raniere specifically referencing Raniere's creation and possession of the November 2005 photographs.  *See, e.g.*, Gov. App'x 1173.  And the electronic folder containing the photographs of Camila also contained nude photographs of other women with whom Raniere had a contemporaneous sexual relationship.  In sum, the jury was presented with sufficient evidence to conclude beyond a reasonable doubt that Raniere was guilty of sexually exploiting Camila.

### c. Conspiracy to Alter Records for Use in an Official Proceeding, in Violation of 18 U.S.C. § 1512(c)(1) (Racketeering Act 6)

Next, Raniere argues that the Government did not prove the existence of a conspiracy to alter records for use in an official proceeding (Act 6).  He concedes that the Government offered evidence that Mark Vincente, one of Raniere's alleged co-conspirators, altered or arranged for the alteration of certain video tapes—which were produced in discovery as part of a federal civil action, *NXIVUM Corp., et al., v. Ross Institute, et al.*, No. 06-CV-1051 (D.N.J.)—at Raniere's direction.  Raniere's Br. 40.  But he argues that the Government did not provide sufficient evidence to prove that Vicente acted with the requisite intent.  We disagree.

For the Government "to satisfy the element of intent," it "must show a 'nexus' between the defendant's act and the judicial proceedings; that is, there must be 'a relationship in time, causation, or logic' such that the act has 'the natural and probable effect of interfering with the due administration of justice.'"  *United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013) (quoting *United*

*States v. Aguilar*, 515 U.S. 593, 599–600 (1995)).  At trial, Vincente testified that he knew the deleted content of the tapes would have been damaging to NXIVM in an ongoing "legal action" and that he understood the alteration of the videos to be "illegal."  Gov. App'x 178–79, 182.  The jury was thus presented with sufficient evidence to conclude that the intent element was satisfied.

### d. Identity Theft Conspiracy, in Violation of 18 U.S.C. § 1028 (Racketeering Act 11)

Raniere also challenges the sufficiency of the Government's evidence as to Racketeering Act 11, which charged Raniere with conspiring to commit identity theft in connection with tax evasion, in violation of 18 U.S.C. § 1028(a)(7) and 1028(f).  In particular, the Government charged Raniere with using the credit card of Pamela Cafritz—his long-term partner who had since died—in order to evade his tax obligations.  [**Gov. App'x 17.**]  Raniere argues that the Government offered no evidence that he had a substantial tax debt or that he ever failed to pay his taxes, as required to prove a substantial violation of the tax evasion statute.  Raniere's Br. 43–44; *see also United States v. Litwok*, 678 F.3d 208, 215 (2d Cir. 2012) (listing elements of a substantive violation of 26 U.S.C. § 7201).

Raniere misapprehends the import of the identity theft statute.  Section 1028 prohibits "knowingly . . . us[ing], without lawful authority, a means of identification of another person with the *intent to commit*, or *to aid or abet*, or *in connection with*, any unlawful activity that constitutes a violation of Federal law . . . ."  18 U.S.C. § 1028(a)(7) (emphasis added).  As the District Court explained in its jury instructions, "the Government does not need to prove that [Raniere] or a co-conspirator actually committed tax evasion."  Jury Charge at 108, *United States v. Mack*, No. 18-CR-204 (NGG) (E.D.N.Y. June 18, 2019), ECF No. 728.  Upon review of the record, we conclude that the Government offered sufficient evidence from which the jury was able to conclude that Raniere entered into a conspiracy to use Cafritz's credit card with the intent to commit, or to aid or abet, or in connection with, tax evasion.[3]

### e. Racketeering and Racketeering Conspiracy, in Violation of 18 U.S.C. § 1962(c) (Counts 1 and 2)

Finally, Raniere argues that his conviction for a racketeering conspiracy (Count 1) and substantive racketeering (Count 2) cannot be sustained because (1) there was insufficient evidence

---

[3] To the extent Raniere also contends that there was not sufficient evidence for the jury to find that he acted without lawful authority when using Cafritz's credit card because he was the executor and sole beneficiary of Cafritz's estate, *see* Raniere Br. 42, we are unpersuaded.  Raniere does not present a developed argument explaining why being the executor and beneficiary of an estate gives one lawful authority to use a deceased person's credit card.

that Raniere's "inner circle" constituted an enterprise for RICO purposes and (2) the Government failed to demonstrate a "pattern" of related racketeering activities as opposed to isolated and sporadic offenses.  Raniere's Br. 15–16.  We are not convinced by either argument.

The RICO statute prohibits persons "employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

Raniere first argues that there was insufficient evidence that Raniere's "inner circle" was an "enterprise" for RICO purposes.  In particular, he argues that the "inner circle" did not share a "common purpose" other than a vague commitment and loyalty to Raniere.  Raniere's Br. 47–48.  But the Indictment alleges that the purpose of the enterprise was "to promote [Raniere] . . . *and* to recruit new members into the Pyramid Organizations [*i.e.*, NXIVM and DOS]," whereby existing members of the enterprise "expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise."  Gov. App'x 2–3, ¶ 4 (emphasis added).  The Government presented evidence at trial that members of the enterprise recruited members into Raniere's organizations and received such benefits.  **[*See, e.g*., Gov. App'x 198.]**

To the extent that Raniere objects to the informal nature of the "inner circle's" membership, *see, e.g.*, Raniere's Br. 49 (arguing that the inner circle "was nothing more than a hodgepodge of people from a wider community"), the Supreme Court has rejected the argument that RICO enterprises must have formal membership or structural requirements, instead emphasizing the "breadth of the 'enterprise' concept in RICO."  *Boyle v. United States*, 556 U.S. 938, 948–49 (2009); *see also* 18 U.S.C. § 1961(4) (defining enterprise as including "any . . . group of individuals associated in fact although not a legal entity"); *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) ("An 'individuals associated in fact' enterprise, 18 U.S.C. § 1961(4), may continue to exist even though it undergoes changes in membership.").  Upon review of the record, we are satisfied that the evidence presented at trial established that the "inner circle" was an enterprise for purposes of the RICO statute.

Next, Raniere argues that the Government failed to establish a "pattern of racketeering activity" as that term is used in Section 1962(c).  The statute requires that there be "at least two acts of racketeering activity" within ten years.  18 U.S.C. § 1961(5).  "[C]riminal conduct forms a pattern of racketeering activity under RICO when it 'embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)).  Relatedness includes both horizontal relatedness—that the predicate acts are related to each other—and vertical relatedness—that the predicate acts are related to the enterprise.  *Id.*  "[B]oth the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise."  *Id.* at 376.

Here, the evidence presented at trial permitted the conclusion that the eleven predicate acts listed in the Indictment were linked to the enterprise.  In arguing otherwise, Raniere arbitrarily groups the eleven predicate acts into three sub-groups: (1) the DOS Acts (Acts 9 and 10); (2) the sexual exploitation and possession of child pornography of Camila (Acts 2, 3, and 4); and (3) non-DOS Acts (Acts 1, 5, 6, 7, 8, and 11).  Raniere's Br. 55–63.  But this grouping does not defeat the conclusion that each of these acts was linked to the enterprise.  *See United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) ("Horizontal relatedness requires that the racketeering predicate acts be related to each other.  However, that relationship need not be direct; an indirect relationship created by the relationship of each act to the enterprise will suffice." (citing *United States v. Polanco*, 145 F.3d 536, 541 (2d Cir. 1998))).  In sum, we find that there was sufficient evidence presented at trial to sustain Raniere's RICO convictions.

## B.  Rule 403 Challenges

Raniere next challenges the District Court's decision to allow the introduction of three categories of evidence: (1) communications between Raniere and Camila; (2) evidence that Camila, Daniela, and Marianna had abortions after being impregnated by Raniere; and (3) photographs of women's genitalia taken by Raniere.  **[Raniere's Br. 64.]**  He argues that these materials should have been excluded as unduly prejudicial under Federal Rule of Evidence 403.  We disagree.

Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  We have frequently noted that we review a district court's balancing under Rule 403 for abuse of discretion.  *See, e.g.*, *United States v. Polouizzi*, 564 F.3d 142, 152 (2d Cir. 2009).  "The 'decision to admit or exclude evidence will not be overturned unless we conclude that the court acted arbitrarily or irrationally.'"  *Id.* (quoting *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994)).

### a.  Communications Between Raniere and Camila

Raniere first challenges the admission of WhatsApp messages between Raniere and Camila, which he argues were of minimal probative value, contained "gratuitous sexually-graphic conversations," and portrayed Raniere as "manipulative, controlling[,] and emotionally abusive."  Raniere's Br. 68, 71.  But as Raniere himself acknowledges, the communications are "relevant to support the [G]overnment's claim that [Raniere] began a sexual relationship with Camila when she was 15 years old and that [he] was the architect of DOS."  *Id.* at 71 (citation omitted).  These communications were highly probative of Raniere's relationship with Camila, whom the Government argued was both a victim of Raniere's child exploitation and a "slave" in DOS.

8

Accordingly, the District Court's decision to admit these communications was far from "arbitrar[y] or irrational[]." *Polouizzi*, 564 F.3d at 152 (quoting *Thai*, 29 F.3d at 813).[4]

### b. Abortion Evidence

Raniere next challenges the District Court's decision to admit evidence—in the form of testimony, medical records, and ultrasound images—that Daniela, Camila, and Marianna had obtained abortions, arguing that such evidence was prejudicial, cumulative, and minimally probative. Raniere's Br. 74. But the abortion material was probative of Raniere's sexual relationship with Camila when she was a minor and to show that Cafritz—who was a member of the charged enterprise and helped procure the abortions—facilitated the abuse of Camila and Daniela. We see no error in the District Court's decision to admit the abortion evidence.

### c. Photographs of Women's Genitalia

Finally, Raniere challenges the District Court's decision to admit 167 photographs of women's genitalia recovered from a hard drive also containing explicit images of Camila taken when she was a minor. He argues that the evidence was cumulative and highly prejudicial. Raniere's Br. 78. But elsewhere, Raniere argues that the existence of explicit images of Camila on the hard drive is not sufficient to establish that it was Raniere who took the photographs of Camila. *See id.* at 35. Thus, even he must concede that the "timeframe in which the . . . photos w[ere] taken shed[s] some light on the question of whether [Raniere] was responsible for taking the Camila photos." *Id.* at 77. The existence of the photographs of other women's genitalia—women with whom Raniere had a contemporaneous sexual relationship—was probative of whether Raniere had taken the photographs of Camila and whether he had had a sexual relationship with her while she was a minor. The District Court did not err in deciding to admit the evidence.

## C. Other Trial-Related Challenges

Raniere also raises two separate challenges concerning trial orders. We address each below.

### a. Prohibition on the Use of Full Names

Prior to the commencement of trial, upon motion by the Government, the District Court ordered that "testifying victims" were to be identified by "a nickname, first name, or pseudonym only" and that "non-testifying DOS victims" were to be "referred to solely by first name or

---

[4] The Government argues that Raniere's objections to the WhatsApp messages were not raised below and should therefore be evaluated for plain error only. We need not decide whether or not Raniere's objections were preserved because, even if they were, we conclude that the District Court did not abuse its discretion in admitting the evidence.

nickname" during trial.  Memorandum & Order at 40, *Mack*, No. 18-CR-204 (May 6, 2019), ECF No. 622.  Raniere argues that this decision violated his rights under the Confrontation Clause of the Sixth Amendment and his due process rights under the Fifth Amendment.  **[Raniere's Br. 85–86.]** We disagree.

A defendant's constitutional right to confront witnesses includes the right to "ask the witness who he is and where he lives," because, "when the credibility of a witness is in issue," these questions are "the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination."  *Smith v. State of Illinois*, 390 U.S. 129, 131 (1968) (quoting *Pointer v. Texas*, 380 U.S. 400, 404 (1965)); *see also Alford v. United States*, 282 U.S. 687, 689 (1931).  The Second Circuit has explained that there are "two central interests" safeguarded by *Smith* and *Alford*.  "First, the defense needs testimony as to a witness' [identity] on cross-examination so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination."  *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970).  "Second, the defense may need the witness to reveal his address [or other identifying information] in court because knowledge of the [identifying information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability."  *Id.*

That said, a district court's decision to limit the scope of cross-examination is reviewed for abuse of discretion.  *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012).  Trial judges have "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  And "[e]ven if a reviewing court finds error, a new trial is not required if the error was harmless."  *White*, 692 F.3d at 244.

Here, in granting the Government's request to prohibit the use of full names, the District Court reasoned that requiring victims to provide their names in public "could chill their willingness to testify, for fear of having their personal histories publicized."  Memorandum & Order at 32, *Mack*, No. 18-CR-204 (May 6, 2019), ECF No. 622.  It also found that Raniere failed to present a particularized need for the witnesses' last names to be disclosed, since he already knew the identity of the individuals and could articulate no reason why disclosing last names would help the jury assess the witnesses' credibility.  As for Raniere's contention that the withholding of the witnesses' last names bolstered their credibility by effectively endorsing their status as victims, the District Court correctly addressed this concern with an appropriate jury instruction.  *Id.* at 32–34.[5]  Under

---

[5] During trial, the District Court instructed the jury that it should "not make any inferences as to the defendant's guilt or non-guilt from the fact that certain last names are being withheld from [the jury] and the public."  Gov. App'x 112; *see also United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021) ("We presume that juries follow limiting instructions.") (cleaned up).

these circumstances, where neither of *Marti*'s two "central interests" are implicated, the District Court's decision was justified, and we see no error in it. 421 F.2d at 1266; *see also Marcus*, 628 F.3d at 45 n.12 (rejecting a similar challenge to a lower court's "decision permitting two of the Government's witnesses to testify using only their first names" on due process grounds).

### b. Termination of Cross-Examination

Raniere also argues that the District Court's improperly terminated Lauren Salzman's cross-examination, again allegedly violating his Sixth Amendment right to confront his accuser and his Fifth Amendment right to due process. We conclude that—even assuming the District Court erred in its termination of the cross-examination—any such error was harmless.

During the lengthy cross-examination of Lauren Salzman—a cooperating Government witness who had previously pleaded guilty to racketeering charges—the District Court ordered that the cross-examination end, saying in front of the jury: "[t]hat's it. We are done." Gov. App'x 396. After the jury was excused, defense counsel objected and the District Court explained that counsel had gone "way over the line," and that he "kept coming back" to a line of questions concerning whether Lauren Salzman had actually had the requisite mental state to have committed the crimes to which she had pleaded guilty. *Id.* The District Court explained that it would not tolerate "someone hav[ing] a nervous breakdown on the witness stand," noted that Lauren Salzman was "a broken person," and expressed concern over Lauren Salzman's "composure." *Id.* at 396–97.

Here, any arguable error was harmless. Raniere vaguely asserts that he was precluded from crossing Lauren Salzman on a range of topics, including: (1) the impact of her potential jail term on her decision to cooperate; (2) "certain other facts" she learned in discovery that caused her to change her view of Raniere and DOS; (3) "certain specific portions" of recordings she heard of meetings between Raniere and other DOS members; and (4) "other aspects" of her plea agreement and her cooperation. Raniere's Br. 81. But Raniere fails to provide any further detail about these potential questions or explain how the inability to address them—after an already lengthy cross-examination that included many questions on related topics—deprived him of his ability to test the veracity of Lauren Salzman's testimony. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 313 (2d Cir. 2006).

Furthermore, after the District Court terminated counsel's cross-examination of Lauren Salzman and at the close of the Government's case-in-chief, the Government stated—and Raniere's counsel confirmed—that the Government had "offered to the defense to make any of its witnesses available" to testify at Raniere's case-in-chief, "including Lauren Salzman," and that Raniere had not elected to avail himself of that opportunity and declined to put on a case. Gov. App'x 976. Under these particular circumstances, we conclude Raniere "suffered no harm" from the District Court's prior decision to cut off Lauren Salzman's cross-examination. *Cf. United States v. Barbarino*, 612 F. App'x 624, 627 (2d Cir. 2015) (summary order) (concluding that any error in limiting defendant's

cross examination of a witness was harmless where "[t]he Government offered to make [the witness] available for further cross-examination by telephone" and "Barbarino has not identified other questions he was prevented from asking on cross-examination").

## II.  BRONFMAN'S APPEAL

On April 19, 2019, Bronfman pleaded guilty to two counts: (1) conspiracy to conceal, harbor, and shield from detection one or more aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and (a)(1)(B)(i); and (2) unlawful transfer and use of a means of identification of another person with the intent to commit and in connection with attempted tax evasion, in violation of 18 U.S.C. § 1028(a)(7), 1028(b)(1)(D), and 1028(c)(3)(A).  At sentencing, the District Court determined that the applicable advisory Guidelines sentencing range was 21 to 27 months' imprisonment and imposed a sentence of, *inter alia*, 81 months' imprisonment.  Bronfman now argues that the District Court committed procedural error.

We review a district court's imposition of a sentence under a "deferential abuse-of-discretion standard."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)); *see also In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (describing the abuse-of-discretion standard).  The imposition of a sentence outside of the advisory Guidelines range does not alter the standard of review.  *Gall*, 552 U.S. at 49.  At root, we evaluate the sentence imposed for "reasonableness," a concept which includes "the procedures used to arrive at the sentence (procedural reasonableness) . . . ."  *United States v. Broxmeyer*, 699 F.3d 265, 278 (2d Cir. 2012).  Procedural error includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  *Gall*, 552 U.S. at 51.

Bronfman principally argues that the District Court committed procedural error by relying on a "clearly erroneous finding"—namely that Bronfman was aware of, or willfully blind to, Raniere's abuses in DOS.  Bronfman's Br. 22.  We disagree.  The District Court explicitly stated that it "agree[d] with Ms. Bronfman that the available evidence does not establish that she was aware of DOS prior to June 2017[6] or that she directly or knowingly funded DOS or other sex trafficking activities."  Sp. App'x 104.  It acknowledged, however, that her "crimes were not committed in a vacuum."  *Id.*  And it found "most troubling" that when, in 2017, Bronfman was "confronted with information about DOS . . . she doubled down on her support of Raniere and pursued her now familiar practice of attacking his critics."  *Id.* at 118–19.  The District Court referred to a December

---

[6] The District Court concluded that, at the latest, Bronfman learned of the existence of DOS in June 2017, when she received emails from former DOS "slaves" who asked her to return or destroy their digital "collateral."  Sp. App'x 104.  No party disputes this fact.

12

2017 public statement that Bronfman released in which "she falsely characterized DOS as a 'sorority' that 'truly benefited the lives of its members.'" *Id.* at 122–23. And it discussed Bronfman's contribution of $13.8 million to an irrevocable trust to pay for the legal fees of Raniere and her other co-defendants. *Id.* at 124. It is in this context that the District Court stated that Bronfman had a "pattern of willful blindness when it comes to Raniere and his activities," and that although Bronfman may not have known of DOS before 2017, "she did not want to know either." *Id.* at 125–26. A full reading of the District Court's lengthy statement (which covers thirty pages of the transcript) shows that it was primarily concerned with Bronfman's actions *after* she found out about DOS in June 2017, including her reinvigorated support of Raniere.

Bronfman also argues that the District Court ignored disparities between her sentence and the sentences imposed on her co-defendants—Mack, Lauren Salzman, and Kathy Russell—in violation of 18 U.S.C. § 3553(a)(6). Section 3553(a)(6) requires a district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But as we have made clear, while "[S]ection 3553(a)(6) requires a district court to consider nationwide sentence disparities," it "does not require a district court to consider disparities between co-defendants." *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (quoting *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008)). In any event, Bronfman's conduct—before and after her indictment—readily distinguishes her from Mack, Salzman, and Russell, two of whom cooperated with the Government and received sentencing reductions pursuant to 18 U.S.C. § 3553(e).

Finally, Bronfman argues that even compared to defendants nationwide, her 81-month sentence was excessive. She points to certain statistics showing that of 27 defendants convicted of both 8 U.S.C. § 1324 and 18 U.S.C. § 1028 offenses nationwide, none received an above-Guidelines sentence. Bronfman's Br. 27. She has filed a motion to supplement the record with the reports she relied on in arriving at that conclusion, ECF No. 183, and that motion is hereby GRANTED. Even so, as the District Court pointed out, "the context of Ms. Bronfman's criminal conduct places her in an[] all together different category from other defendants convicted of the same offenses." Sp. App'x 129. Upon review of the record, including the material contained in ECF No. 183 and its supporting documents, we find that the District Court acted well within its discretion in arriving at its conclusion.

### III.  CONCLUSION

To summarize:

(1) Bronfman's motion to supplement the record, ECF No. 183, is hereby **GRANTED**.
(2) Having considered all of Bronfman's remaining arguments and found them to be without merit, for the foregoing reasons, we **AFFIRM** the October 7, 2020 judgment of the District Court.

(3) Having considered all of Raniere's remaining arguments and found them to be without merit, for the foregoing reasons, and for the reasons explained in our opinion also entered today—affirming the District Court's judgment of conviction entered on October 30, 2020 as it concerns the sex trafficking conspiracy (Count 5), the sex trafficking of Nicole (Count 6), the attempted sex trafficking of Jay (Count 7), and the racketeering act of sex trafficking of Nicole (Act 10A)—we **AFFIRM** all other portions of the October 30, 2020 judgment of the District Court, including, but not limited to, the racketeering conspiracy (Count 1), the racketeering (Count 2), the sexual exploitation of a child – Camila (Acts 2 and 3), the conspiracy to alter records for use in an official proceeding (Act 6), the forced labor of Nicole (Act 10B), the conspiracy to commit identity theft of Pamela Cafritz (Act 11), and the forced labor conspiracy (Count 3).

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

14